**TARRANT COUNTY, Texas, Appellant.**

v.

**Roy ENGLISH and Gayle English, d/b/a Dakota Industries, Apellees.**

**No. 2–97–067–CV.**

Court of Appeals of Texas, Fort Worth.

Nov. 12, 1998.

Rehearing Overruled Jan. 7, 1999.

Shannon, Gracey, Ratliff and Miller, L.L.P., Anne Gardner, Vic Anderson, Jr., Fort Worth, for Appellant.

Haynes and Boone, L.L.P., Matthew D. Goetz, Craig M. Price, Mark Hill, Fort Worth, for Apellees.

Before DAY, LIVINGSTON and RICHARDS, JJ.

## OPINION

RICHARDS, Justice.

### I. Introduction

Roy English and Gayle English, d/b/a Dakota Industries (collectively, English), sued Tarrant County, Texas (the County) for damages to English's real property. English owned a tract of land adjacent to the County's property. He alleged that spilled diesel fuel migrated from the County's property onto his property and contaminated it, causing him damages. English sought to recover from the County on theories of inverse condemnation, nuisance, and negligence. At the close of the evidence, the trial court granted English a directed verdict against the County on his inverse condemnation theory. The jury found for English on his nuisance and negligence theories, and the trial court rendered judgment for English. We reverse and render in part, reform in part, and affirm as reformed.

### II. Background Facts

In 1986, English purchased a 46.125–acre tract of unimproved, agricultural land on Farm Road 1187 in south Fort Worth. The tract was L shaped. On the north, it was adjacent to a 15–acre tract that the County owned and used to operate the Tarrant County Precinct 1 Garage.

The County kept paving equipment on its tract, and the employees there performed paving jobs and fixed potholes in roads and bridges within the precinct. Two above-ground storage tanks (ASTs) containing diesel fuel were also located on the County's property, about 10 feet from the property line north of English's tract. From 1985 to 1991, county employees sprayed diesel from the ASTs onto the beds of county dump trucks to prevent asphalt from sticking to the truck beds. During this process, some of the diesel spilled on the ground and soaked into the soil beneath the ASTs. In an effort to keep the ground as clean as possible, an employee would periodically clean up the area where the ASTs were and put the stained material into the County's road-building base material.

English financed his land purchase through Texas Commerce Bank. In February 1990, he defaulted on his note with the bank and wanted to deed his property to the bank in lieu of foreclosure. In connection with this proposed conveyance, the bank requested a preliminary environmental assessment from an environmental engineering firm. The Level I site assessment report, submitted to the bank in November 1990, noted that non-County property east of English's tract had been formerly used as an electroplating business and had been declared by the EPA to be a CERCLA site. Although no leakage was indicated from the ASTs on the County's property, the report noted that the soil around the ASTs was stained, indicating "overfill and spillage." The report recommended a Level II environmental assessment to determine the presence or absence of contamination on English's property from the electroplating business to the east and from the ASTs on the County's property to the north.

In late 1990, the bank hired Halff Associates, Inc. (Halff) to conduct the Level II environmental assessment. Halff drilled five boreholes on English's property and took soil samples from each at two-foot intervals. The soil samples were then tested for "TPH" (total petroleum hydrocarbons) and "BTEX" (benzene, toluene, ethyl benzene, and total xylenes). One sample showed a TPH concentration of 130 parts per million (ppm). This sample was taken eight feet down in the borehole nearest to, but slightly uphill from, the ASTs (BH–1). No TPH was found in a second borehole east of, and slightly downhill from, the ASTs (BH–2).[1] Diesel is a petrole-

---

1. Test results on samples from the remaining boreholes are not relevant to this appeal.

um hydrocarbon, but it has a minimal BTEX component. Thus, BTEX concentrations in soil taken from the property did not indicate that diesel was present.

The Halff report recommended that the bank obtain additional testing to determine the extent and degree of contamination on English's property. As a result of the Halff report, the bank asked the County to commit to containment and remediation of the affected soil, although the bank characterized the contamination on English's property as "minimal."

In February 1991, English received a copy of the Halff report from the bank. English then photographed the County's property, including the ASTs and some stained areas. He also contacted the County about the findings in the Halff report.

In March 1991, the County hired Maxim Engineers, Inc. (Maxim) to conduct independent testing. Jim Stewart, the County's special projects director, was in charge of hazardous materials management and disposal. Stewart worked with Maxim in the latter part of March and in April 1991. Maxim drilled five boreholes on the *County's* land in the AST area and where there was evidence of surface staining. Levels of TPH at less than 20 ppm were found in three of the boreholes.[2] A TPH level of 6580 ppm was found in a borehole drilled in the middle of the driveway in front of the ASTs. In addition, a TPH level of 442 ppm was found in a borehole near some construction materials well north and downhill of English's property. Based on its findings, in April 1991, Maxim recommended that the TWC be notified and that the County conduct additional investigation and submit a remediation plan to the TWC.

In a May 1991 letter to English, the County advised him that all activities connected with the ASTs had been stopped. The County offered to remove all the contaminated dirt from English's property as well as from the County's property and to restore the land with uncontaminated soil, in return for a

written agreement concluding the entire matter. In response to this settlement offer, English gave the County two options: clean up English's property and pay him $508,000 in damages, or purchase the property from English at its appraised value of $1,270,000.

In August 1991, Maxim conducted further testing for the County. This time, Maxim drilled holes on English's property to determine any impact from the diesel spilled on the County's property. The tests revealed that the TPH levels in all eight of the boreholes drilled in August 1991 were well below the TWC action level.

Maxim conducted the March and August 1991 tests using the EPA 418.1 method, which did not distinguish between naturally-occurring hydrocarbons in the soil and diesel or gasoline. In October 1991, Maxim drilled a ninth borehole on English's property, at some point between the tanks and the Halff BH–1 borehole. This location was intended to determine whether any seepage or migration of diesel had occurred from the AST area to the Halff BH–1 borehole. Using the EPA 418.1 test, Maxim found TPH levels of 33 ppm at two feet and 30 ppm at eight feet—well below the TWC action level. Then Maxim used a gas chromograph analysis to determine the *type* of hydrocarbons present. The analysis showed that the hydrocarbons in the October 1991 samples were not compatible with diesel. Based on its testing and findings, Maxim concluded there was no contamination of English's property by diesel fuel.

Finally, in August 1992, the bank obtained another environmental assessment of English's property—this time from ENTRIX, Inc. Using the gas chromograph analysis, ENTRIX found no evidence of affected soils on English's property due to migration of hydrocarbons from the County's property. Consequently, in December 1992, the bank agreed to take English's property in lieu of foreclosure, and English deeded his property back to the bank in return for cancellation of much of his indebtedness.

---

2. The Texas Water Commission (TWC) required remediation of soil when TPH concentrations exceeded 100 ppm. A TPH concentration above 100 ppm was referred to as an "action level."

The TWC is now the Texas Natural Resources Conservation Commission, but we refer to this entity as the TWC throughout this opinion.

English then sued the County in January 1993.

## III. Inverse Condemnation

In its first issue on appeal, the County asserts that the trial court erred in ruling for English on his inverse condemnation claim.

■ The Texas Constitution provides that "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person...." TEX. CONST. art. I § 17. If the government appropriates property without paying adequate compensation, the owner may recover the resulting damages in an "inverse condemnation" suit. *See Westgate, Ltd. v. State,* 843 S.W.2d 448, 452 (Tex.1992). To recover based on an inverse condemnation theory, a property owner must establish that: (1) the State or other governmental entity intentionally performed certain acts (2) that resulted in the taking, damaging, or destruction of the owner's property (3) for public use. *See Bennett v. Tarrant Co. Water Control & Imp. Dist.,* 894 S.W.2d 441, 448 (Tex.App.— Fort Worth 1995, writ denied).

■ Whether a "taking" has occurred under inverse condemnation is a question of law. *See id.; see also Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 932–33 & n. 3 (Tex.1998). The essential element that must exist for a taking to be compensable is that the private property must be taken for, or applied to, public use. *See Texas Highway Dep't v. Weber,* 147 Tex. 628, 219 S.W.2d 70, 72 (1949).

■ When private property is damaged or destroyed merely as the result of governmental employees' negligence, it is not taken or damaged for public use. *See Weber,* 219 S.W.2d at 71; *see also City of Tyler v. Likes,* 962 S.W.2d 489, 505 (Tex.1997). There is no "taking" unless the damage was authorized by the State in the exercise of its lawful authority or was necessarily incidental to the governmental action. *See Dallas County Flood Control Dist. v. Benson,* 157 Tex. 617,

306 S.W.2d 350, 351 (1957); *Weber,* 219 S.W.2d at 71. Mere negligence is not the lawful exercise of governmental authority. *See State v. Hale,* 136 Tex. 29, 146 S.W.2d 731, 737 (1941).

At the close of the evidence, English made a motion for the trial court to determine that a compensable taking under article I, section 17 had occurred as a matter of law when diesel migrated from the County's property to English's property and contaminated it. The trial court granted the motion. This ruling is akin to a directed verdict.[3] In reviewing a directed verdict on a legal issue such as this one, we review all the evidence in the light most favorable to the party who suffered the adverse judgment. *See S.V. v. R.V.,* 933 S.W.2d 1, 8 (Tex.1996).

■ As we discuss in section V, there is some evidence that the diesel that dripped from the County's dump trucks eventually migrated from the subsurface of the County's property into the subsurface of English's property. However, there is no evidence that the County intended, authorized, or even knew of the migration until after it had occurred.

First, the County did not use English's property for preparing the dump trucks with diesel fuel. Also, Robert Davis, a former county employee, testified that he never believed the diesel was getting onto English's property in any way. If Davis had known diesel was migrating onto English's property, he would have changed the operations. Indeed, after learning of English's complaints, the County began using biodegradable material as a release agent instead of diesel. Likewise, Ray Rike, the assistant district attorney charged with handling English's claim, testified that, after seeing English's photographs of the area around the ASTs, he told county employees to stop using the ASTs for any purpose. Rike instructed Stewart, the County's special projects director, to move the tanks in December 1991 and verified that they were moved. English also testified that he did not know whether

---

**3.** A directed verdict is proper when the evidence conclusively establishes the right of the movant to judgment. *See Boswell v. Farm & Home Sav. Ass'n,* 894 S.W.2d 761, 768 (Tex.App.—Fort Worth 1994, writ denied).

county employees knew that diesel might be migrating onto his property.

This evidence shows that the only county-authorized activity was the preparation of dump trucks to haul and release asphalt. The migration of the diesel fuel onto English's property was not authorized or intended by the County, and the County changed its practices as soon as it realized that migration might have occurred.

Moreover, the fact that English's property was damaged by migration of the diesel does not mean that this damage was necessary for performance of the governmental activity—preparing the truck beds. *See, e.g., Weber*, 219 S.W.2d at 71 (holding no taking occurred where burning of plaintiff's crops was neither authorized nor necessary for state employees' clearing of grass along adjacent highway). Indeed, the evidence shows that the damage was not necessary: the County could have used biodegradable material as a release agent, as it did after learning of English's allegations of contamination.[4]

At most, the evidence shows that any migration of diesel fuel from the County's property onto English's property was the result of negligent dripping of diesel from the trucks onto the ground. Indeed, English even premised his inverse condemnation claim on the County's improper handling of the diesel. He pleaded: "If these petroleum products are not properly stored or handled and are, as a result, released into the ground, then contamination and pollution of the adjoining land ... results."

Because migration of the diesel onto English's property was neither authorized nor necessary for preparation of the truck beds, we hold that the trial court erred in ruling that a taking had occurred under article I, section 17 and in granting English a directed

verdict on his inverse condemnation claim. We sustain the County's first issue.

## IV.  Nuisance

In its second issue, the County contends that English is not entitled to recover based on nuisance because there is no evidence of any nuisance beyond that arising from the County's negligent use of diesel fuel.

■ Nuisance is an alternate ground of recovery under article I, section 17. *See City of Abilene v. Downs*, 367 S.W.2d 153, 159 (Tex.1963). A municipality[5] is liable for the creation or maintenance of a nuisance in the course of the non-negligent performance of a governmental function. *See Shade v. City of Dallas*, 819 S.W.2d 578, 581 (Tex. App.—Dallas 1991, no writ). To be a nuisance within the exception to governmental immunity, the condition must in some way constitute an unlawful invasion of the property or rights of others that is inherent in the thing or condition itself, beyond that arising from its negligent or improper use. *See Shade*, 819 S.W.2d at 581; *City of Uvalde v. Crow*, 713 S.W.2d 154, 156 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.). Thus, if the governmental function cannot be performed non-negligently without injuring a private citizen's property, the governmental entity "must stand the loss." *Abbott v. City of Kaufman*, 717 S.W.2d 927, 931 (Tex.App.—Tyler 1986, writ dism'd) (quoting *Brewster v. City of Forney*, 223 S.W. 175, 176 (Tex. Comm'n App.1920, judgm't adopted)).

■ In this context, "non-negligence" means beyond negligence, as in gross negligence or an intentional act. *See Sipes v. Texas Dep't of Transp.*, 949 S.W.2d 516, 522 (Tex.App.—Texarkana 1997, writ denied). But if a nuisance is caused by the negligent performance of a governmental function, then the governmental entity is protected

---

4. We also note that the jury found that hydrocarbons had migrated from the County's property to English's property and that the County was negligent in allowing the migration to occur. At least one Texas court has held that a lack of evidence of intentional taking, coupled with a jury finding of negligence, is not a "taking" of the plaintiff's property under the Texas Constitution. *See City of Abilene v. Smithwick*, 721 S.W.2d 949, 951 (Tex.App.—Eastland 1986, writ ref'd n.r.e.).

5. Maintenance of streets and bridges are governmental functions for which a municipality may be liable. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.0215(4) (Vernon Supp.1998). The County questions whether the non-negligent nuisance theory is viable against a county because it is not a municipality. In light of our disposition of this point, we need not address this issue.

from liability because of governmental immunity. *See id.* A nuisance claim cannot be made merely by pleading negligent acts and labeling them a nuisance. *See Shade,* 819 S.W.2d at 581; *Crow,* 713 S.W.2d at 156.

In this case, the jury found that hydrocarbons had migrated from the County's property to English's property and that the County was negligent in allowing the migration to occur. The jury also found that the County had created a nuisance. However, the jury further found that the County's negligence was not gross negligence. When read together, these findings merely establish that the County's negligence in allowing the hydrocarbons to migrate to English's property created the nuisance. Because the jury found that the County was not grossly negligent and because a governmental entity is immune from liability for a nuisance caused by simple negligence, the jury's findings will not support recovery for English on his nuisance theory. We sustain issue two.

## V. Negligence

### A. Operation or Use of Motor Vehicle

In its sixth issue, the County contends that English is not entitled to judgment based on the jury's finding of negligence because the spraying of diesel fuel on the beds of county dump trucks did not constitute operation or use of a motor-driven vehicle under the Texas Tort Claims Act.

The Texas Tort Claims Act provides:

A governmental unit in the state is liable for:

(1) property damage ... caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage ... arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law[.]

Tex. Civ. Prac. & Rem.Code Ann. § 101.021(1) (Vernon 1997).

Whether a governmental entity's conduct falls within the scope of this statute is a question for the fact finder. *See Mount Pleasant Indep. Sch. Dist. v. Lindburg,* 766 S.W.2d 208, 211 (Tex.1989). Jury question 2 asked the jury if a county employee's negligence "arising from the operation or use of a motor-driven vehicle or motor-driven equipment proximately caused damage" to English's property. The jury answered "Yes."

"Operation or use" is not defined in the statute. However, the Texas Supreme Court has stated that "operation" refers to "a doing or performing of a practical work," and "use" means "to put or bring into action or service; to employ for or apply to a given purpose." *Mount Pleasant,* 766 S.W.2d at 211. In this case, the trial court's jury instructions on "operation" and "use" adopted the *Mount Pleasant* court's definitions of these terms. The supreme court has also held that the phrase "arises from" requires a nexus between the injury negligently caused by a governmental employee and the operation or use of a motor-driven vehicle or piece of equipment. *See LeLeaux v. Hamshire–Fannett Indep. Sch. Dist.,* 835 S.W.2d 49, 51 (Tex.1992).

The County does not contend that its dump trucks were not motor-driven vehicles, but asserts that there was no nexus between their operation or use and the damage to English's property because the trucks were not in use when the diesel fuel was applied to them. We disagree.

The record in this case shows that county employees spilled diesel fuel on the ground while preparing dump trucks to haul asphalt for use in the maintenance of county roads. The record also contains evidence that some of the diesel migrated from the County's property to English's property. We hold that this evidence is sufficient to support the jury's finding that the negligent operation or use of a motor-driven vehicle damaged English's property. The fact that the trucks were not pouring asphalt on county roads when English's property was injured does not defeat this finding. The trucks were in use because they were being prepared to transport and release asphalt onto county roads. Coating the truck beds with diesel

was part of the County's overall road maintenance operation. *See County of Galveston v. Morgan,* 882 S.W.2d 485, 491 (Tex.App.—Houston [14th Dist.] 1994, writ denied) (holding that dump truck was in use as part of county's overall road resurfacing operation when accident occurred, even though truck was not then in motion and was not dumping resurfacing materials on road). We overrule the County's sixth issue.

## B. Proximate Cause

In issue three, the County contends the evidence is legally and factually insufficient to establish that diesel migrated from the County's property to English's property and thus, that English did not prove proximate cause.

In determining a legal sufficiency issue, we are to consider all of the evidence in the light most favorable to the party in whose favor the verdict has been rendered, and to indulge every reasonable inference from the evidence in that party's favor. *See Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence. *See Formosa Plastics Corp.,* 960 S.W.2d at 48; *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996).

In determining a factual sufficiency issue, we are to consider whether the evidence supporting a fact finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *See Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965).

■ To recover from the County, English had to show that diesel migrated from the County's property onto English's property and caused him damages. *See Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 731 (Tex.1984) (plaintiff must plead and prove both that defendant's conduct caused an event and that event caused plaintiff's injuries). Causation must be established by evidence of probative value. *See McClure v. Allied Stores of Texas, Inc.,* 608 S.W.2d 901, 903 (Tex.1980). Absolute certainty is not required, however; the plaintiff only needs to establish a reasonable probability that his injuries were caused by the defendant's negligence. *See Lenger v. Physician's Gen. Hosp., Inc.,* 455 S.W.2d 703, 706 (Tex.1970).

■ To establish causation, English relied on the expert testimony of Kent Belaire, a geologist with Halff. Belaire testified that Halff drilled two boreholes on English's property to test for diesel migration from the ASTs: BH–1 and BH–2. Belaire noted a hydrocarbon odor in the soil samples collected between 8 and 11 feet down in BH–1. Test results revealed a TPH level of 130 ppm in BH–1, indicating the presence of petroleum hydrocarbons. No TPH was found in BH–2.

Belaire testified that the drainage flow from the area of the County's property where the ASTs were located was from south to north-northeast, i.e., away from BH–1. English also concedes that his property is uphill from the County's property.

Because the ASTs were downhill from BH–1and surface drainage flow was away from BH–1 rather than towards it, Belaire explained how diesel from the ASTs could have migrated onto English's property. He opined that, after soaking down into the ground several feet, the diesel on the County's property might have spread out in a pancake fashion if it reached less permeable soil. Belaire admitted that he did no testing to determine if such a layer of soil existed in the area. But the evidence shows that the soil in BH–1 was permeable and that less permeable soil was encountered on English's and the County's properties at various depths between 6 and 15 feet. One of Maxim's reports also noted that the hard limestone surface beneath these properties "appeared highly undulatory." This evidence supports Belaire's migration theory.

Belaire also acknowledged that the EPA 418.1 testing method Halff used did not distinguish diesel fuel from other hydrocarbons, including those naturally occurring in the ground. Belaire admitted that TPH can oc-

cur naturally but opined that a TPH level of 130 ppm is higher than would occur naturally. Based on the testing that he performed, Belaire concluded that the probable source of contamination in BH–1was diesel from the ASTs.

Moreover, two 1991 studies conducted by Maxim showed diesel contamination. Maxim's testing on the County's property in April 1991 revealed the presence of TPH in most of the boreholes, at concentrations ranging from·less than 20 to more than 6500 ppm. Based on field observations and soil test results, Maxim recommended that a remedial action plan be developed and submitted to the TWC for approval.

In August 1991, Maxim tested samples from four boreholes on English's property. Although the TPH levels in those boreholes were below TWC action levels, Maxim confirmed the existence of "significant" contamination on English's property in the immediate vicinity of the ASTs on the County's property. Maxim again recommended that a remedial action plan for both English's and the County's properties be prepared and submitted to the TWC for approval.

We hold that this evidence is legally and factually sufficient to support the jury's finding that diesel migrated from the County's property to English's property and proximately caused damage to English's property.

Although Maxim's October 1991 test of a ninth borehole on English's property and ENTRIX's August 1992 tests revealed no diesel contamination, this evidence is not dispositive of the contamination issue. Both Maxim's and ENTRIX's experts admitted that the boreholes they tested were not drilled near BH–1, where Halff found the hydrocarbons in late 1990. ENTRIX's expert also testified that ENTRIX did not test the Halff sample in which the TPH level of 130 ppm was found, although the expert conceded that Halff's sample could have been retested. Accordingly, these later test results did not controvert English's evidence regarding BH–1.

Because the evidence supports the jury's finding of proximate cause, we overrule the County's third issue.

## VI. Evidence of Settlement Offer

In its seventh issue, the County asserts that the trial court committed reversible error by admitting evidence of the County's pretrial settlement offer to English.

During English's testimony near the beginning of trial, the trial court admitted into evidence the County's May 1991 settlement letter to English. The County objected to the admission of the letter because it was a settlement offer. The Texas Rules of Evidence prohibit the admission of settlement negotiations to prove a party's liability. *See* Tex.R. Evid. 408. But evidence of settlement negotiations may be admitted for other purposes, such as establishing that statements made during the negotiations were misrepresentations. *See id.; Portland Sav. & Loan Ass'n v. Bernstein,* 716 S.W.2d 532, 537 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1200, 89 L.Ed.2d 313 (1986), *overruled on other grounds, Dawson–Austin v. Austin,* 968 S.W.2d 319, 323 (Tex.1998). In this case, the trial court admitted the letter for the limited purpose of showing English's state of mind.

The letter stated:

When the Commissioners Court first learned of this claim, it contacted our consulting engineer for environmental matters. They prepared a plan for investigating the site. In March the county and this firm entered into a contractual relationship. The firm then went on to [sic] our property and conducted subsurface soil borings. Unfortunately, the first samples came back inconclusive. The site was retested.

We hope you understand that we needed our own tests by our own consultants so that we might determine the source of the contamination for ourself [sic]. This is what we propose to do now that testing is complete.

All activities on our property that could have caused this problem have stopped and will never resume. The contaminated soil on our property will be removed to a landfill. Furthermore, we are willing to re-

move the contaminated soil on [your] property and take it to a landfill. We would like to do the whole operation at once and restore the land with uncontaminated soil. Now that we know the extent of the problem, we will notify the Texas Water Commission prior to any clean-up.

However, in order to go on to [sic] your property, we need a written agreement that concludes this whole affair. I understand that Commissioners Court wants to restore [you] to [your] position prior to the contamination. If [you] would be interested in this approach, please contact me immediately.

English read this letter to the jury. He then testified that, based on the letter, he had understood that test results from the first samples the County had taken on its property were inconclusive and that the County would take care of the contamination problem on his property. The County argues that English offered the settlement letter only to convince the jury that (i) the County was liable to English, and (ii) the County believed it had contaminated English's property.

During closing arguments, English's counsel argued to the jury:

Concerned, Roy goes to the County and tells them, listen, here's this report I've gotten. Here are these pictures. I've got a problem. I've got a problem. What does the County do? Don't worry. Don't worry, Roy, we're going to take care of it. We're going to remediate your property. We're going to get it fixed. We are sure that's what the Commissioner's Court wants to do.

The County objected to this argument, asserting that its letter to English was admitted only to show English's state of mind. The trial court overruled the objection, based on its belief that the letter was later admitted for all purposes. English does not direct us to any place in the record where the letter was admitted for all purposes.

■ The trial court has the discretion to decide whether evidence is being impermissibly offered as evidence of a settlement offer, or whether it is being offered for some other

valid reason. *See TCA Bldg. Co. v. Northwestern Resources Co.*, 922 S.W.2d 629, 636 (Tex.App.CWaco 1996, writ denied). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable. *See Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *See Downer*, 701 S.W.2d at 241–42.

In this case, the County's assertion in its letter that "the first samples came back inconclusive," so that its property had to be retested, is correct. But the letter does not give any information about the test results, which the County had in its possession before it sent the settlement letter in May 1991. Indeed, Maxim's April 1991 report showed significant contamination on the County's property in the AST area. The gist of English's position was that the County misrepresented to English its knowledge about contamination on its own property—by not notifying him of the April 1991 test results in the May 1991 settlement letter. Because the County was not forthcoming with this information, the trial court could have concluded that the County had attempted to mislead English through the settlement letter. Hence, we cannot say that the trial court abused its discretion by admitting the settlement letter for the limited purpose of showing English's state of mind.

■ The trial court *did* err in overruling the County's objection to English's closing argument set out above. But most of English's remaining argument about the letter focused on the County's alleged attempts to mislead English, not on the County's admission of liability. Consequently, the trial court's error did not cause the rendition of an improper judgment in this case. *See* TEX. R.APP. P. 44.1. We overrule issue seven.

## VII. Damages

In its fourth issue, the County complains that the damages award in the trial court's judgment is not supported by the evidence. The judgment awarded English $1,270,000 in actual damages, plus pre-and post-judgment interest. The County contends that this amount should be reduced by the $755,918.92 value English received from the bank when it took back English's property in lieu of foreclosure. In the alternative, the County asserts that the judgment should be reformed to limit English's recovery to $100,000—the damages cap set by the Texas Tort Claims Act.

■ The Texas Tort Claims Act limits a local governmental unit's liability to $100,000 for each single occurrence for injury to property. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.023(b) (Vernon 1997). A county is a local governmental unit. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.001(3)(B) (Vernon Supp.1998) (including counties within definition of "governmental unit"). Further, the damage caused to English's property by diesel migration from the County's property was a single occurrence of injury. *See Texas Dep't of Mental Health & Mental Retardation v. Petty*, 817 S.W.2d 707, 720 (Tex. App.—Austin 1991), *aff'd*, 848 S.W.2d 680 (Tex.1992) (holding that patient confined for decades as mentally ill and mentally retarded when she was neither could recover damages from State only up to amount of Texas Tort Claims Act's damages cap for single occurrence of negligence, although patient argued that her injuries were caused by successive occurrences of negligence).

Because the County is a local governmental unit and the damage it caused to English's property was a single occurrence of injury, the trial court should have limited the County's liability to $100,000. We sustain issue four.

## VIII. Temporary vs. Permanent Injury

■ In its fifth issue, the County complains that the trial court erred by refusing to submit a jury question about whether the damage to English's property was temporary or permanent. English contends that the damage was permanent, but the County asserts that a fact issue existed about whether it was temporary.

The character of an injury as either permanent or temporary is determined by its continuum. Permanent injuries to land result from an activity of such a character and existing under such circumstances that it will be presumed to continue indefinitely; the injury must be constant and continuous, not occasional, intermittent or recurrent. Temporary injuries, however, have been found where the injury is not continuous, but is sporadic and contingent upon some irregular force such as rain. *Bayouth v. Lion Oil Co.*, 671 S.W.2d 867, 868 (Tex.1984); *see also Atlas Chem. Indus. v. Anderson*, 524 S.W.2d 681, 684 (Tex.1975).

The record shows that the injury-producing activity in this case could have been presumed to continue indefinitely. The County's practice of using diesel to prepare its truck beds for hauling asphalt continued from 1985 through 1991. The County did not stop this activity until English contacted county representatives about possible contamination problems on his property. The potential for injury was also constant and continuous. For six years, the County sprayed diesel on every dump truck that carried a load of asphalt from the precinct garage on the County's property.

We believe this evidence shows that the damage to English's property was permanent. *See Tennessee Gas Transmission Co. v. Fromme*, 153 Tex. 352, 269 S.W.2d 336, 338 (1954) (holding that damage resulting from a continuous flow of polluted water onto plaintiff's land for over two years was permanent as a matter of law). There is no evidence that English's property damage was sporadic or contingent upon some outside force, such as the weather. Moreover, there is no evidence that the damage to English's property ceased, because no one retested soil in the area of BH–1 to determine whether petroleum hydrocarbons were still present or were gone. The fact that English's injury could be remedied upon a discontinuance of the negligent activity did not change the injury from permanent to temporary. Accordingly, the trial court did not err by refus-

ing to submit a jury question on whether English's injury was temporary or permanent. We overrule the County's fifth issue.

### IX. Conclusion

 We reverse the trial court's judgment for English on the inverse condemnation and nuisance claims and render judgment that English take nothing from the County on those claims. We render judgment that English recover from the County only on the negligence claim. We reform the damages award in the judgment to $100,000, including prejudgment interest,[6] and affirm the damages award as reformed.

---

**6.** Prejudgment interest is an element of damages and is not recoverable under the Texas Tort Claims Act if the interest would cause the total damages to exceed the damages cap contained in the Act. *See Weller v. State,* 682 S.W.2d 234, 234 (Tex.1984) (op. on reh'g); *Canutillo Indep. Sch. Dist. v. Olivares,* 917 S.W.2d 494, 499 (Tex. App.—El Paso 1996, no writ).