

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00210-CV

———————————————

TEXAS DEPARTMENT OF LICENSING AND REGULATION, Appellant

V.

KENNETH BARRICK, Appellee

On Appeal from the 236th District Court
Tarrant County, Texas
Trial Court No. 236-315998-20

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

William VanHook[1]—an employee of Appellant Texas Department of Licensing and Regulation (TDLR)—was driving to a jobsite when he nearly collided with a motorcyclist, Appellee Kenneth Barrick. Although Barrick was able to avoid the collision by slamming on his brakes, the near-miss knocked his bike to the ground and left him with personal injuries. Attributing his injuries to VanHook's negligence, Barrick sued TDLR to recover his damages. But TDLR insisted that Barrick's own negligence had contributed to the incident because, as Barrick admitted, he lacked a motorcycle license.

The parties tried their case to the bench, and although they disputed responsibility for Barrick's injuries—each claiming that the other was negligent—they generally agreed upon the circumstances of the incident itself. The court entered judgment against TDLR, finding no negligence on Barrick's part and awarding him more than $250,000 in medical expenses and noneconomic damages.

TDLR appeals, arguing that a new trial is necessary because (1) the overwhelming weight of the evidence established Barrick's negligence; and (2) there was no evidence supporting the reasonableness of Barrick's past medical expenses or

---

[1]Portions of the reporter's record use the last name "VanHorn" rather than "VanHook," but based on the evidence admitted at trial, the instances of "VanHorn" appear to be erroneous.

the existence of many of his alleged noneconomic injuries. Because neither argument has merit, we will affirm.

## I. Background

## A. The Incident

The incident occurred on a 35-mph roadway in the middle of a well-lit, clear day. Barrick testified that he had been riding his motorcycle in the leftmost of two southbound lanes when VanHook—who had been in an access lane along the righthand side of the road—"rapidly" cut across the lanes in front of him. VanHook later explained the reason for his actions, stating that he had needed to make a U-turn at the upcoming intersection and that he had not seen or heard Barrick's motorcycle. VanHook conceded that, had he seen the motorcycle, he would not have cut into Barrick's lane, as it would have been unsafe to do so. Regardless, when VanHook's sedan veered into Barrick's lane, Barrick slammed on his brakes, sending his motorcycle into a destabilizing "skid" that forced the bike to the ground and sent Barrick "roll[ing] about three or four times."

VanHook immediately stopped, apologized, and called 911. The resulting police crash report—which was admitted into evidence at trial—documented that VanHook had "made an unsafe lane change and veered into [Barrick's lane]," and that "[t]o avoid being run over by [VanHook]," Barrick had "laid the motorcycle on its . . . side." Although Barrick was riding his motorcycle without a license, the on-scene police officer did not give him a ticket; instead, he ticketed VanHook.

3

**B. Evidence of Non-Licensure and Safety Practices**

At trial, TDLR argued that Barrick bore at least some responsibility for the incident because he lacked a motorcycle license.

TDLR asserted that Texas's motorcycle licensing course taught safety practices that—had Barrick learned and implemented—could have prevented the incident or mitigated Barrick's injuries. It offered testimony from an expert in motorcycle licensing and safety who identified multiple actions that he believed Barrick should have taken, such as selecting a different lane position to maximize his "escape paths"; speeding up to avoid VanHook's vehicle; honking his horn to get VanHook's attention; wearing reflective, abrasion-resistant apparel; and using "progressively harder braking" rather than sudden braking. The expert confirmed that all of these safety practices were taught in the licensing course, that he believed Barrick could have implemented them, and that they would have decreased the likelihood of the incident and the severity of Barrick's injuries.

But even the expert conceded that the recommended practices might not have prevented the incident. And he acknowledged that, had Barrick taken the motorcycle licensing course and learned the relevant practices, he would presumably have done so when he moved to Texas, which was more than a decade before the incident occurred. Plus, the expert described many of the skills taught in the licensing course—such as progressively harder braking—as "perishable," meaning that "unless

4

you practice on a regular basis [after learning them in the licensing course], those skills kind of go away."

Barrick, meanwhile, testified that, although he lacked a motorcycle license, he had been riding motorcycles since "the early '70s" and had not been in an accident or received a ticket on his motorcycle in more than 45 years. He described the "safety check" that he performed on his motorcycle before each ride and confirmed that, on the day of the wreck, he had performed the safety check, he had been wearing a helmet, and he had been traveling at the 35-mph speed limit.

As for his actions at the moment of the incident, Barrick explained that he "had no other option" but to hit his brakes because VanHook's sedan had been "right on top of [him]," there was "a center island on the left side of [him]," and he "wouldn't have been able to gun the motorcycle and get out in front quick enough." He confirmed that by slamming on his brakes, he was able to narrowly miss the sedan's rear bumper and avoid a collision.[2]

## C. Barrick's Injuries and Medical Expenses

Despite avoiding a direct collision, Barrick did not escape unscathed. He recalled that his forceful contact with the ground caused considerable bleeding and road rash on his body. After being kept overnight at the hospital, Barrick sought chiropractic treatment for pain in his back, legs, shoulders, arms, and hands. But

[2]At trial, VanHook acknowledged that Barrick's efforts to avoid a direct collision were what had caused him to crash to the ground.

5

while such treatments alleviated much of Barrick's pain, the pain in his right hand persisted, so he sought treatment from a medical doctor.[3]

The doctor gave Barrick steroid shots, and although the shots helped "a little bit," the duration of relief was limited. Barrick was then referred to "a thumb doctor," who recommended surgery, which Barrick underwent about a year after the incident. Afterwards, he spent several months in a splint, then several weeks doing "painful" thumb rehabilitation. Despite all of this treatment, Barrick's grip strength was not restored, and the pain in his right hand continued. According to Barrick, one of his doctors told him that there was nothing else that could be done for his hand and that "[i]t is what it is." And, at the time of trial—more than four years after the incident—it remained painful for Barrick to use his right hand, even for basic tasks such as writing.

Barrick's ongoing medical issues generated multiple medical expenses. So, before trial, Barrick served TDLR with 14 sets of itemized medical bills accompanied by Section 18.001 affidavits confirming his expenses' reasonableness and necessity. *See generally* Tex. Civ. Prac. & Rem. Code Ann. § 18.001. Although TDLR responded with 7 controverting affidavits of its own, at trial, it agreed to the admission of Barrick's 14 affidavit-accompanied medical bills into evidence.

---

[3]Barrick testified that he was right-handed.

6

## D. Judgment

After hearing the evidence, the trial court found that VanHook (and thus TDLR) was negligent; that Barrick was not negligent; and that the incident had caused Barrick more than $250,000 in economic and noneconomic damages. As relevant here, the damage award included $121,346.28 for past medical expenses; $30,000 for past physical pain and mental anguish; another $30,000 for other past noneconomic damages; more than $80,000 in pre-judgment interest on the past damages; and additional amounts for future noneconomic damages. Because the total damage award exceeded the statutory cap applicable to governmental entities, *see id.* § 101.023(a), the trial court reduced the award to $250,000 and entered judgment accordingly.

## II. Discussion

TDLR challenges (1) the factual sufficiency of the trial court's finding that Barrick was not negligent; and (2) the legal sufficiency of the awards for past medical expenses, for past mental anguish, and for certain future damages.

## A. Factual Sufficiency of No-Negligence Finding

TDLR first raises a factual sufficiency challenge, claiming that the trial court's failure to find that Barrick was negligent was contrary to the great weight and preponderance of the evidence.

### 1. Standard of Review

When reviewing the factual sufficiency of a negative finding or failure to find, we analyze whether the negative finding is so contrary to the overwhelming weight of the credible evidence that a new trial must be ordered. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761–62 (Tex. 2003); *Lee v. Carmona*, No. 02-16-00443-CV, 2018 WL 1192240, at *1 (Tex. App.—Fort Worth Mar. 8, 2018, no pet.) (mem. op.); *Campbell v. Perez*, No. 02-14-00248-CV, 2015 WL 1020842, at *1 (Tex. App.—Fort Worth Mar. 5, 2015, no pet.) (mem. op.). Although we consider and weigh the entire record in this analysis, the factfinder remains the sole judge of the witnesses' credibility and the weight to be given their testimony; we cannot substitute the factfinder's judgment with our own.[4] *Golden Eagle Archery*, 116 S.W.3d at 761; *Lee*, 2018 WL 1192240, at *1; *Campbell*, 2015 WL 1020842, at *1.

### 2. No-Negligence Finding

TDLR argues that the undisputed evidence that Barrick was driving without a motorcycle license required a finding of negligence. According to TDLR, "[w]ithout proper basic safety instruction and a motorcycle license, Barrick was careless from the

---

[4]TDLR requested findings of fact and conclusions of law, but the trial court did not file any, and TDLR does not complain of this failure on appeal. When, as here, no findings of fact or conclusions of law are filed, the trial court's judgment implies all findings of fact necessary to support it. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017).

moment he got on his motorcycle the day of the accident,"[5] and "[a] motorcyclist of ordinary prudence would have . . . applied the procedures taught in the [licensing] class to avoid the accident or minimize [his] injuries."

But this theory of negligence is disjointed. To prove that Barrick bore some percentage of responsibility based on his negligence, TDLR was required to show not only (1) that he deviated from the standard of ordinary care, i.e., that he "fail[ed] to do that which a person of ordinary prudence would have done under the same or similar circumstances"; but also (2) that the same deviation—not some other deviation from the standard of care—caused or contributed to his damages. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.003(a) (providing for apportionment of responsibility based on plaintiff's negligence); *Sturdivant v. Anderson*, No. 02-22-00467-CV, 2023 WL 4780924, at *3 (Tex. App.—Fort Worth July 27, 2023, no pet.) (mem. op.) (defining negligence in car-wreck case); *see also Nabors Well Servs., Ltd. v. Romero*, 456 S.W.3d 553, 560–64

---

[5]TDLR describes Barrick's alleged fault as "contributory negligence," but the legislature has instead adopted the doctrine of proportionate responsibility. *See Area Metro. Ambulance Auth. v. Reed*, No. 02-22-00406-CV, 2023 WL 3017936, at *6 n.8 (Tex. App.—Fort Worth Apr. 20, 2023, no pet.) (mem. op.) (noting appellant's use of term "contributory negligence" and explaining that the legislature "eliminated this doctrine in 1973" and has since adopted proportionate responsibility); *see also K & K Inez Props., LLC v. Kolle*, No. 13-21-00460-CV, 2023 WL 8941487, at *9 n.5 (Tex. App.—Corpus Christi–Edinburg Dec. 28, 2023, pet. filed) (mem. op.) (similar). Either way, the substance of TDLR's argument seeks apportionment of responsibility, which is consistent with the current statutory scheme. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.003(a).

(Tex. 2015) (explaining that, in apportioning responsibility, factfinder must consider both occurrence-causing and injury-causing conduct).

Here, TDLR points to one inaction—Barrick's failure to obtain a license—as Barrick's deviation from the standard of care, and it points to a different inaction—Barrick's failure to implement the licensing course's recommended safety practices—as having caused or contributed to his damages. These are two distinct theories of negligence. Although TDLR treats the two as interchangeable, they are not equivalent; there was no evidence that licensure itself guarantees a motorcyclist's compliance with the licensing course's recommended practices. TDLR cannot mix and match between its theories of negligence. *See Nabors Well Servs.*, 456 S.W.3d at 562–63 (emphasizing that plaintiff can be apportioned responsibility "as long as it can be shown the plaintiff's conduct 'caused or contributed to cause' his personal injury or death").

And perhaps because TDLR attempted to mix and match, there was no overwhelming evidence of either theory. First, assuming that Barrick's failure to obtain a motorcycle license was a deviation from the standard of ordinary care, *see* Tex. Transp. Code Ann. §§ 521.084, .085(a), TDLR does not explain—much less did it prove—how non-licensure caused the crash or contributed to Barrick's injuries. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.003(a) (providing for apportionment of responsibility based on "each person's causing or contributing to cause in any way the harm for which recovery of damages is sought"); *Rodriguez-Escobar v. Goss*, 392 S.W.3d

10

109, 113 (Tex. 2013) (explaining that, "[f]or a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission . . . the harm would not have occurred"). "[L]ack of a license does not, as a matter of law, make a driver liable or constitute a proximate cause of a collision." *Medina v. Salinas*, 736 S.W.2d 224, 225 (Tex. App.—Corpus Christi–Edinburg 1987, writ denied) (distinguishing negligent entrustment cases and emphasizing that the "[a]ppellant needed to show that appellee's negligence was the proximate cause of the collision"); *see Flanigan v. Carswell*, 324 S.W.2d 835, 838 (Tex. 1959) (holding that "the failure of [appellee] to secure a cha[u]ffeur's license, as required by statute, was not as a matter of law a proximate cause of the collision between the two motor vehicles involved"), *overruled on other grounds by Larson v. Cactus Util. Co.*, 730 S.W.2d 640 (Tex. 1987); *Langdeau v. Pittman*, 337 S.W.2d 343, 360 (Tex. App.—Austin 1960, writ ref'd n.r.e.) (holding motorist's failure "to have a current driver's or operator's license did not, as a matter of law, make him civilly liable for damages for personal injuries arising from the operation of his car").

The second negligence theory fares no better. To prove that Barrick's alleged failure to implement the licensing course's recommended safety practices was negligent, TDLR was required to show that this failure was a deviation from what a reasonably prudent motorcyclist would have done in the same or similar circumstances. *See Sturdivant*, 2023 WL 4780924, at *3. And this was the subject of

11

conflicting evidence at trial—putting the question squarely within the factfinder's purview. *See Lee*, 2018 WL 1192240, at *4 (reviewing factual sufficiency in car-wreck case and noting that the "standards of ordinary care [in such cases] cannot be fixed with any degree of certainty but must be left in large measure to the trier of the facts"); *Campbell*, 2015 WL 1020842, at *1 (reviewing sufficiency challenges in car-wreck case and reiterating that "the fact[]finder is the sole judge of the credibility of the witnesses and the weight to be given their testimony").

Barrick testified to the various safety practices he had implemented, including performing a "safety check" before his motorcycle ride, wearing a helmet, traveling at the speed limit, continuously scanning the road to remain aware of the vehicles around him, and immediately applying the brakes when VanHook invaded his lane. The evidence that Barrick had not been in a motorcycle accident or received a ticket on his motorcycle for more than 45 years also provided some proof that he adhered to safety practices when operating his motorcycle. And it was undisputed that some of the safety practices Barrick implemented—namely, his immediate braking—were successful in avoiding a direct collision with VanHook's vehicle.

While TDLR's expert opined that Barrick could and should have implemented additional safety practices taught in the licensing course, the expert conceded that some of the practices (such as wearing protective apparel) were based on the individual rider's "choice[s]," that others (such as using progressive braking) were "perishable skills," and that others (such as honking or speeding up to avoid a

12

collision) required a certain amount of reaction time to implement—time that Barrick testified he did not have. The expert's testimony did not overwhelmingly establish that a motorcyclist in Barrick's circumstances—a motorcyclist who had been riding for decades without any accidents and who was traveling on a 35-mph road in the middle of a clear day—would necessarily have implemented all of the practices recommended in the licensing course.

Viewing the record as a whole, the overwhelming weight of the evidence did not require a negligence finding under either of TDLR's theories: TDLR failed to prove that Barrick's non-licensure caused or contributed to his damages, and the great weight and preponderance of the evidence did not establish that Barrick deviated from the safety practices that a reasonably prudent motorcyclist would have implemented. TDLR cannot meld the two theories together to fix each theory's evidentiary flaws.

We overrule TDLR's first issue.

## B. Legal Sufficiency of Damage Awards

TDLR's second issue challenges the legal sufficiency of the evidence to support the trial court's awards for Barrick's (1) past medical expenses, (2) past mental anguish, and (3) various future damages. We need only address the first two of these.

### 1. Standard of Review

The evidence is legally insufficient to support an award of damages if there is no more than a mere scintilla of credible evidence to support it. *See Gunn v. McCoy*,

13

554 S.W.3d 645, 658 (Tex. 2018); *Boxer Prop. Mgmt. Corp. v. Dehnel*, No. 02-22-00336-CV, 2024 WL 3282541, at *22 (Tex. App.—Fort Worth July 3, 2024, pet. filed) (mem. op.). To make this determination, we consider evidence favorable to the award if a reasonable factfinder could, we disregard contrary evidence unless a reasonable factfinder could not, and we indulge "every reasonable inference deducible from the evidence" in support of the challenged award. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Boxer Prop. Mgmt.*, 2024 WL 3282541, at *22. As in our factual sufficiency analysis, the factfinder remains the sole arbiter of the witnesses' credibility and the weight to be given their testimony, and we must defer to the factfinder's resolution of disputed fact issues. *Boxer Prop. Mgmt.*, 2024 WL 3282541, at *22.

## 2. Past Medical Expenses

TDLR first argues that Barrick presented legally insufficient evidence of the reasonableness of his past medical expenses. It acknowledges that Barrick's medical bills were admitted into evidence with affidavits confirming their reasonableness, but it claims that these affidavits lacked evidentiary value because they were controverted in accordance with Section 18.001 of the Texas Civil Practice and Remedies Code. *See generally* Tex. Civ. Prac. & Rem. Code Ann. § 18.001. Thus, TDLR reasons, Barrick was required to present expert testimony to establish that his medical expenses were

14

reasonable, and because he failed to do so,[6] the evidence of reasonableness was legally insufficient.

But TDLR misunderstands Section 18.001. Under that statute, a plaintiff may serve statutorily compliant affidavits confirming the reasonableness and necessity of his itemized medical expenses, and unless the defendant responds with controverting affidavits, the plaintiff's affidavits—which would normally be inadmissible hearsay—are admissible at trial to establish the expenses' reasonableness and necessity. *See id.* § 18.001(b). If the defendant controverts the plaintiff's Section 18.001 affidavits, though, then the plaintiff's affidavits remain inadmissible hearsay, forcing him to call one or more experts to demonstrate his expenses' reasonableness and necessity. *See id.*; *In re Allstate Indem. Co.*, 622 S.W.3d 870, 876, 881–82 (Tex. 2021) (orig. proceeding); *Perez v. Williams*, No. 02-21-00395-CV, 2022 WL 17351581, at *6 (Tex. App.—Fort Worth Dec. 1, 2022, no pet.) (mem. op.). Here, then, because TDLR controverted many of Barrick's Section 18.001 affidavits, those controverted affidavits were subject to exclusion at trial as inadmissible hearsay.

But admissibility is not the same as evidentiary value, and Section 18.001 alters the former but not the latter.[7] *See Perez*, 2022 WL 17351581, at *6–8[8] (explaining that

---

[6]Barrick presented expert testimony from one of his health care providers, but TDLR argues that the provider's testimony was insufficient on its own to establish reasonableness. Because this argument assumes that the testimony was standing on its own, i.e., that Barrick's Section 18.001 affidavits lack evidentiary value, we need not address it. *See* Tex. R. App. P. 47.1.

Section 18.001 is "an evidentiary statute" and rejecting appellant's "implicit[] assum[ption] that his filing of controverting Section 18.001 affidavits robbed [the plaintiff's] unobjected-to Section 18.001 affidavits of evidentiary value" (footnote omitted)); *see also Gunn*, 554 S.W.3d at 672, 674 (repeatedly emphasizing that "[S]ection 18.001 is purely procedural" (internal quotation marks omitted)). Thus, as we have cautioned before, a defendant cannot rely on the inadmissibility of controverted Section 18.001 affidavits to prevent the factfinder from considering them; the defendant must object to the affidavits' admission into evidence at trial. *Perez*, 2022 WL 17351581, at *6–7 (explaining that, after defendant controverted plaintiff's Section 18.001 affidavits, he "could not rely solely on [his] procedural victory" and "was still required to object to [the] inadmissible Section 18.001 affidavits

[7]TDLR claims that, in *Cotton Patch Cafe v. McCarty* and *McDaniel v. Dindy*, this court held that controverted Section 18.001 affidavits "are reduced to receipts of amounts paid and cannot support a judgment," even if the affidavits are admitted into evidence without objection. But this court held no such thing. *See McDaniel v. Dindy*, 673 S.W.3d 24, 30, 39, 42 (Tex. App.—Fort Worth 2023, no pet.) (corr. op.) (noting that Section 18.001 affidavits were not admitted into evidence at trial, that "there was no testimony or documents in evidence that addressed the reasonableness of past medical expenses," and that the "only evidence about past medical expenses was the amount paid"); *Cotton Patch Cafe v. McCarty*, No. 2-05-082-CV, 2006 WL 563307, at *4 (Tex. App.—Fort Worth Mar. 9, 2006, no pet.) (mem. op.) (noting that plaintiff's invoices were admitted into evidence but that plaintiff "neither offered an affidavit in compliance with [Section 18.001] nor proved that his medical expenses were reasonable and necessary through expert testimony").

[8]TDLR attempts to distinguish *Perez* by pointing out that *Perez* involved a factual sufficiency challenge rather than a legal sufficiency challenge. We fail to see how this alters the nature of Section 18.001 or the evidentiary value of Barrick's affidavits.

16

when they were offered into evidence at trial"); *see* Tex. R. Evid. 802 (noting that hearsay evidence admitted without objection has probative value). TDLR did not object to the admission of Barrick's controverted affidavits, so the factfinder could consider them as evidence of the reasonableness of Barrick's medical expenses. *See Perez*, 2022 WL 17351581, at *7–8 (holding that, because defendant failed to object to admission of plaintiff's controverted Section 18.001 affidavits, the jury could consider them).

And apart from the controverted nature of Barrick's Section 18.001 affidavits, TDLR does not take issue with them; it does not dispute that the affidavits were statutorily compliant, it does not argue that they were conclusory, and it does not challenge the affiants' qualifications. *See id.* at *8 (noting similarly and affirming award of past medical expenses based on unobjected-to controverted Section 18.001 affidavits). Nor does it argue that the amount awarded exceeded the total medical expenses reflected in Barrick's Section 18.001 affidavits; to the contrary, TDLR acknowledges that the trial court's award was slightly less than the expenses shown in Barrick's affidavits.[9] Barrick's unobjected-to Section 18.001 affidavits were thus "sufficient evidence to support a finding of fact . . . that the amount charged was

---

[9]Barrick's Section 18.001 affidavits documented $121,446.28 in past medical expenses, and the trial court awarded $121,346.28—$100 less. The reason for this discrepancy is unclear.

reasonable." Tex. Civ. Prac. & Rem. Code Ann. § 18.001(b); *see Perez*, 2022 WL 17351581, at *6–8.

We overrule the medical-expense portion of TDLR's damages issue.

### 3.    Past Mental Anguish

TDLR next challenges the trial court's $30,000 award for Barrick's past mental anguish. But this award did not stand alone. The trial court awarded $30,000 for the combined categories of past physical pain and past mental anguish, and TDLR does not challenge the sufficiency of the evidence to support the $30,000 award based on Barrick's past physical pain.[10]

When multiple categories of damages are combined into a single award, each included category provides independent support for the award, and we must affirm if any included category is unchallenged or supported by sufficient evidence. *See Golden Eagle Archery*, 116 S.W.3d at 771 (citing *Price v. Short* and explaining that "a challenge must address all the [types of damages] that could have been considered by the jury in making its total, single-amount award," and "[i]f there is just one [type] that is supported by the evidence," the damages award can be affirmed); *Price v. Short*, 931 S.W.2d 677, 688 (Tex. App.—Dallas 1996, no writ) ("The only way that an appellant can successfully attack on appeal a multi-element damages award is to address all of

---

[10]In a single sentence, TDLR complains of the trial court's combining past mental anguish and past physical pain into a single damage award. But TDLR neither explains why it believes that combining the two was erroneous nor cites any legal authority to support its complaint, and it does not list its assertion as a separate issue presented. *Cf.* Tex. R. App. P. 38.1(f), (i), 38.9.

the elements . . . [; t]he failure to address an element of damages results in waiver of the sufficiency challenge."). We therefore affirm the combined award for past physical pain and mental anguish based on the unchallenged evidence of Barrick's past physical pain. This portion of TDLR's damages issue is overruled.

### 4. Future Noneconomic Damages

Finally, TDLR challenges the legal sufficiency of the evidence to support two of the trial court's awards for future noneconomic damages: its awards for (1) future physical pain and mental anguish and (2) future physical impairment. Even without these two future-damage awards, though, the other damage awards—the past-damage awards already affirmed, the past-damage awards not challenged on appeal, the pre-judgment interest on those amounts, and the future-damage awards not challenged on appeal—exceed the $250,000 statutory cap. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.023(a) (limiting state liability to money damages "in a maximum amount of $250,000 for each person"); *Weller v. State*, 682 S.W.2d 234, 234–35 (Tex. 1984) (op. on reh'g) (including pre-judgment interest in amount subject to statutory cap); *Tarrant Cnty. v. English*, 989 S.W.2d 368, 380 n.6 (Tex. App.—Fort Worth 1998, pet. denied) (similar). In other words, the amount of TDLR's liability will remain the same whether the two challenged future-damage awards stand or fall. Therefore, we need not address these challenges, *see* Tex. R. App. P. 47.1, and we overrule this final portion of TDLR's damages issue.

19

### III. Conclusion

Having overruled TDLR's issues, we affirm the trial court's judgment. *See* Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: December 19, 2024