CITY OF DALLAS, Appellant

v.

Don BLANTON; Deep Ellum I, Ltd.; Deep Ellum II, Ltd.; Deep Ellum III, Ltd.; 2615–17 Commerce Street Partnership; Jernigan Realty Partners, LP; Robert Merrill and Karen L. Merrill; International Lion's Lairs, L.L.C.; Wayne Bazzle; Cheryl Bazzle; Crystaline E. Wheeler; Linda L. Kluck; Sandra S. Coone; Sam W. Owen; J.R. Gilpin; Crugar S. Ragland, Trustee of the Ragland Property Trust; Henry J. Evans; Park–A–Lot, LP; Peter Fonberg, Trustee of the Jeannette Schwartz Trust; Peter Fonberg, Trustee of the Hymie Schwartz Trust; and Caron Barrett, Appellees.

No. 05–05–00736–CV.

Court of Appeals of Texas, Dallas.

Aug. 16, 2006.

Barbara E. Rosenberg, Dallas City Attorney's Office, Dallas, for Appellant.

Bruce E. Bagelman, Law Office of Bruce Bagelman, P.C., Dallas, for Appellees.

Before Justices WHITTINGTON, BRIDGES, and LANG–MIERS.

## OPINION

Opinion by Justice LANG–MIERS.

This is an inverse condemnation law suit brought by property owners against the City of Dallas seeking damages and a declaratory judgment. The property owners are Don Blanton; Deep Ellum I, Ltd.; Deep Ellum II, Ltd.; Deep Ellum III, Ltd.; 2615–17 Commerce Street Partnership; Jernigan Realty Partners, LP; Robert Merrill and Karen L. Merrill; International Lion's Lairs, L.L.C.; Wayne Bazzle; Cheryl Bazzle; Crystaline E. Wheeler; Linda L. Kluck; Sandra S. Coone; Sam W. Owen; J.R. Gilpin; Crugar S. Ragland, Trustee of the Ragland Property Trust; Henry J. Evans; Park–A–Lot, LP; Peter Fonberg, Trustee of the Jeannette Schwartz Trust; Peter Fonberg, Trustee of the Hymie Schwartz Trust; and Caron Barrett.

The City filed a plea to the jurisdiction asserting governmental immunity. The trial court denied the City's plea and this

interlocutory appeal followed. We conclude the trial court erred by denying the City's plea to the jurisdiction. Accordingly, we reverse the trial court's order and render judgment dismissing the claims against the City for want of jurisdiction.

## I. BACKGROUND

The City of Dallas implemented a plan to replace old, substandard sewer mains in the Deep Ellum area of Dallas. Those mains were located, for the most part, underneath and at the back of appellees' properties. The plan involved installing new mains in the rights-of-way in the front of appellees' properties and, at an undetermined date, discontinuing maintenance of the old mains. As part of its plan, the City installed service lines from the new main to appellees' property lines. The City told appellees that they would have to reroute their plumbing at their expense from the old main in the back of their properties to the new service lines in the front, but the City agreed not to charge appellees a fee to connect their plumbing to the new service lines.

Appellees demanded the City reroute appellees' plumbing at city expense, including repairing any damage to the buildings caused by rerouting the plumbing. When the City refused, appellees sued for damages for inverse condemnation. They also sought a declaration that a Dallas city ordinance required the City to reroute appellees' plumbing at city expense and that the Texas constitution does not prohibit the City's voluntary payment of the costs to reroute appellees' plumbing. In its plea to the jurisdiction, the City argued, among other things, that the trial court did not have subject matter jurisdiction because appellees did not allege a facially valid claim for inverse condemnation.

On appeal, the City claims that governmental immunity defeats the trial court's jurisdiction over the claims. It contends its immunity has not been waived because the plaintiffs did not plead and cannot plead a "taking" under article I, section 17 of the Texas constitution. It also claims that appellees' request for declaratory relief has no independent jurisdictional basis and is an effort to obtain an advisory opinion that will not resolve any controversy. It contends the trial court erred by denying the City's plea to the jurisdiction.

## II. PLEA TO THE JURISDICTION

A trial court must determine whether it has the constitutional or statutory authority to decide a case at the earliest possible date. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex.2004). Whether a court has subject matter jurisdiction is a question of law. *Id.* Governmental immunity deprives a trial court of subject matter jurisdiction and is properly asserted in a plea to the jurisdiction. *Id.* at 225–26.

When a plea to the jurisdiction challenges the pleadings, the trial court must construe the pleadings liberally in favor of the pleader. *Id.* at 226. If the pleadings do not allege facts sufficient to affirmatively demonstrate jurisdiction but the defects in pleading are curable by amendment, the issue is one of pleading sufficiency and the pleader should be afforded an opportunity to amend. *Id.* at 226–27. However, when a plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court must consider the relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised. *Id.* at 227. If the evidence creates a fact question regarding the jurisdictional issue, the trial court must deny the plea to the jurisdiction and submit the issue to the fact finder. *Id.* at 227–28. Conversely, if the evidence is undisputed or fails to raise a fact ques-

tion on the jurisdictional issue, the trial court should rule on the plea to the jurisdiction as a matter of law. *Id.* at 228.This standard generally mirrors that of summary judgment. *Id.* We review the trial court's ruling de novo. *Id.*

### III. INVERSE CONDEMNATION

 Governmental immunity affords a city protection from suit when the city engages in the exercise of governmental functions unless that immunity is clearly waived. *City of Dallas v. Jennings,* 142 S.W.3d 310, 315 (Tex.2004); *Harris County v. Sykes,* 136 S.W.3d 635, 638 (Tex. 2004). Providing sanitary sewer service is a governmental function that is afforded governmental immunity. *Jennings,* 142 S.W.3d at 315. However, article I, section 17 of the Texas constitution waives governmental immunity for valid inverse condemnation claims.[1] *Gen. Servs. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 598 (Tex.2001); *City of Carrollton v. Harlan,* 180 S.W.3d 894, 897 (Tex.App.-Dallas 2005, pet. denied); *see Bell v. City of Dallas,* 146 S.W.3d 819, 825 (Tex.App.-Dallas 2004, no pet).

 Inverse condemnation occurs when property is taken for public use without proper condemnation proceedings and the property owner attempts to recover compensation for that taking. *City of Abilene v. Burk Royalty Co.,* 470 S.W.2d 643, 646 (Tex.1971). To state a cause of action for inverse condemnation under the Texas constitution,[2] a plaintiff must allege (1) an intentional governmental act; (2) that resulted in his property being taken, damaged, or destroyed; (3) for public use. *Little–Tex,* 39 S.W.3d at 598; *Wilkinson v. Dallas/Fort Worth Int'l Airport Bd.,* 54 S.W.3d 1, 12 (Tex.App.-Dallas 2001, pet. denied), *cert. denied,* 534 U.S. 1128, 122 S.Ct. 1065, 151 L.Ed.2d 968 (2002). Takings are classified as either physical or regulatory. *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 933 (Tex.1998), *cert. denied,* 526 U.S. 1144, 119 S.Ct. 2018, 143 L.Ed.2d 1030 (1999). A physical taking is an unwarranted physical appropriation or invasion of the property. *See id.* A compensable regulatory taking can occur when a governmental agency imposes restrictions that either deny a property owner all economically viable use of his property or unreasonably interferes with the owner's right to use and enjoy the property. *Id.* at 935; *Taub v. City of Deer Park,* 882 S.W.2d 824, 826 (Tex.1994); *Wilkinson,* 54 S.W.3d at 13. Whether particular facts are sufficient to allege a constitutional tak-

---

1. Article I, section 17 provides:

 No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; and, when taken, except for the use of the State, such compensation shall be first made, or secured by a deposit of money; and no irrevocable or uncontrollable grant of special privileges or immunities, shall be made; but all privileges and franchises granted by the Legislature, or created under its authority shall be subject to the control thereof.

 Tex. Const. art. I, § 17.

2. Appellees do not assert a takings claim under the federal constitution; they assert their claim under the Texas constitution, arguing it provides broader protection to property owners. *See DuPuy v. City of Waco,* 396 S.W.2d 103, 108–09 (Tex.1965) (discussing reason Texas constitution provides broader protection than federal constitution). However, in their brief, appellees cite and analogize to federal takings cases. And the Texas Supreme Court has held that federal takings cases should serve as a guide for analyzing takings claims under the Texas constitution. *Sheffield Dev. Co. v. City of Glenn Heights,* 140 S.W.3d 660, 669 (Tex.2004). Accordingly, we will consider takings cases decided under the federal constitution when helpful to our analysis.

ing is a question of law. *Little–Tex,* 39 S.W.3d at 598; *Bell,* 146 S.W.3d at 825. When a plaintiff does not allege a valid inverse condemnation claim, governmental immunity applies and the trial court should grant a plea to the jurisdiction. *Bell,* 146 S.W.3d at 825.

## IV. TAKINGS CLAIM

The City claims the requirement that appellees pay to reroute the plumbing on their properties is not a physical or regulatory invasion of those properties. It argues that there has not been a waiver of immunity because there has not been a taking or inverse condemnation. Appellees contend it is not necessary that their properties be physically destroyed or taken to establish a takings claim. They contend they may establish a takings claim by showing physical damage or interference with the right to use or enjoy or a diminution of desirability of their properties.

*Appellees' Pleadings*

In their First Amended Petition, appellees allege as follows:

Dallas' acts set forth above, constitute a taking, damaging or destroying Appellees' property for or application of public use without adequate compensation having been made in violation of Section 17 of Article I of the Constitution of the State of Texas. It is clear that Dallas' acts are causing a direct substantial interference with the use and enjoyment of, and damage to, Appellees' property. Dallas knows that the replacement of the substandard waste water mains in Deep Ellum and refusal to reconnect existing service connections is causing identifiable harm to the affected properties and that the damage to the affected properties is necessarily an incident to, or necessarily a consequential result of Dallas' action. Further, Dallas is acting against the economic interests of Appel-

lees' for its own benefit. Accordingly Appellees are entitled to recover from Dallas their damages resulting from the taking, damaging or destroying of Appellees' property.

On appeal, appellees argue, "[t]he relocation of the lines is benefit[t]ing the public but harming Appellees who are relying on the existing lines. Lack of sewer service or sewage waste backing up onto Appellees' properties no doubt damages their properties, interferes with the right to use and enjoy their properties and makes their properties less desirable." Appellees also claim the City's poor planning caused the problem because the City allowed construction over the sewer lines located underneath appellees' properties.

### A. *Physical Takings Claim*

A governmental action can cause a physical invasion of property that rises to the level of a constitutional taking even though it may not physically appropriate the property. *See, e.g., Tarrant Reg'l Water District v. Gragg,* 151 S.W.3d 546 (Tex. 2004) (flooding caused by construction and operation of reservoir and dam changed character of cattle ranch such that property no longer useable for intended purpose); *Steele v. City of Houston,* 603 S.W.2d 786 (Tex.1980) (police intentionally set fire to house to catch escaped convicts hiding inside); *City of Austin v. Teague,* 570 S.W.2d 389 (Tex.1978) (property owner lost all use of land when city denied development permit and sought to impose servitude on property for scenic easement); *DuPuy v. City of Waco,* 396 S.W.2d 103 (Tex.1965) (construction of viaduct deprived owner of all reasonable access); *Gainesville, H. & W.R. Co. v. Hall,* 78 Tex. 169, 14 S.W. 259 (Tex.1890) (invasion from noxious vapors and noise from operation of railroad); *City of Lubbock v. Tice,* 517 S.W.2d 428 (Tex.App.-Amarillo 1974, no

writ) (nuisance from operation of landfill); *City of Houston v. McFadden*, 420 S.W.2d 811 (Tex.App.-Houston [14th Dist.] 1967, writ ref'd n.r.e.) (vibration and noise from low-flying airplanes intruded airspace).

Appellees argue their pleadings are sufficient to allege claims for a physical taking of their properties because they track the language in the Texas Supreme Court's decision in *City of Dallas v. Jennings*, 142 S.W.3d 310 (Tex.2004). They contend the decision of whether their claim is *valid* is a different decision that should be made by the fact finder. We disagree.

Merely designing the pleadings to track language in *Jennings* does not satisfy the standards established by *Miranda* because we review the pleadings as well as the evidence submitted below on the plea to the jurisdiction. *Miranda*, 133 S.W.3d at 227.

Additionally, the *Jennings* case addressed a different issue. In *Jennings*, the Texas Supreme Court reviewed a case where the Jenningses claimed the City negligently failed to maintain a sewer main, which caused it to back up and flood the Jenningses' home with raw sewage. *Id.* at 311. The Jenningses sued the city for inverse condemnation and nuisance. The issue was whether the summary judgment evidence was sufficient to prove the first element of inverse condemnation—an intentional governmental act—and the type of intent required. The supreme court held that "when a governmental entity physically damages private property in order to confer a public benefit, that entity may be liable under Article I, Section 17 if it (1) knows that a specific act is causing identifiable harm; or (2) knows that the specific property damage is substantially certain to result from an authorized government action...." *Id.* at 314. The court held that because the summary judgment evidence did not demonstrate the City ei-

ther knew the home would be damaged or that damage was substantially certain to result, there was no intentional taking and the trial court properly granted summary judgment for the City dismissing the case.

In *Jennings*, there was actual physical damage to the property because the sewer flooded the Jenningses' home with raw sewage. The issue in that case was whether the conduct was intentional, not whether there had been physical damage or invasion to the property. Conversely, the issue in this case is whether there has been physical or regulatory invasion of the property, not whether the conduct was intentional.

■ We conclude the evidence submitted did not raise a fact issue on physical taking. There was no claimed damage other than having to pay to reroute the plumbing. The evidence did not show any physical invasion of the properties and any physical harm is expected to occur in the future, if at all. We do not find language in *Jennings* to support a claim for a physical invasion that has not yet occurred. *See generally Jennings*, 142 S.W.3d 310; *see also Hubler v. City of Corpus Christi*, 564 S.W.2d 816, 821–22 (Tex.App.-Corpus Christi 1978, writ ref'd n.r.e.) (no compensable taking because no present physical injury from drainage improvements). As a result, we conclude appellees have not submitted evidence demonstrating the trial court has jurisdiction based on their allegation of physical taking.

### B. *Regulatory Taking*

■ Appellees also contend the City's relocation of the sewer main and refusal to pay to reroute appellees' plumbing constitutes a regulatory taking because it caused a direct and substantial interference with their use and enjoyment of their properties.

A regulatory taking may occur when the governmental restriction denies the property owner all economically viable use of the property or renders the property valueless. *See Mayhew*, 964 S.W.2d at 935. A diminution in market value may or may not constitute a compensable taking under the Texas Constitution because " 'all property is held subject to the valid exercise of the police power.' " *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 669–70 (Tex.2004) (quoting *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 804 (Tex.1984)); *see Eller Media Co. v. City of Houston*, 101 S.W.3d 668, 682 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (exercise of police power not taking if substantially related to health, safety, or general welfare of public and not arbitrary).

Recognizing that the government should not be expected to pay for every diminution in value caused by changes in the general law, the supreme court noted that there is no single solution or set formula for determining when compensation is required. Rather, resolution of the issue requires a "careful analysis of how the regulation affects the balance between the public's interest and that of private landowners." *Sheffield*, 140 S.W.3d at 670–72; *see Westgate Ltd. v. State*, 843 S.W.2d 448, 452 (Tex.1992) (no compensation for economic damage to property caused by proposal to condemn property in future); *Allen v. City of Texas City*, 775 S.W.2d 863, 865 (Tex.App.-Houston [1st Dist.] 1989, writ denied) (no compensation for levee construction that caused decrease in property value or increased susceptibility to flooding).

A regulatory taking may also occur when the governmental restriction unreasonably interferes with the property owner's right to use and enjoy the property. Courts consider many factors in striking this balance, but the factors are not exhaustive and must be considered in light of the circumstances of each case. *Sheffield*, 140 S.W.3d at 672–73. These factors include (1) the economic impact on the claimant, (2) the extent to which the regulation interfered with investment-backed expectations, and (3) the character of the governmental action. *Id.* (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)); *see Mayhew*, 964 S.W.2d at 935; *Taub*, 882 S.W.2d at 826. An allegation of unreasonable interference with an owner's use and enjoyment of property must state a direct, immediate, and substantial impact on the property, making it unusable for its intended purpose. *Cummins v. Travis County Water Control & Improvement Dist. No. 17*, 175 S.W.3d 34, 54–55 (Tex.App.-Austin 2005, pet. denied). In determining the economic impact of the regulation, we compare the value that has been taken from the property to the value that remains in the property. *Mayhew*, 964 S.W.2d at 935–36. We do not consider the loss of anticipated gains or potential future profits. *Id.* at 936. In considering the investment-backed expectations, the existing and permitted uses of the property are the "primary expectation" of the property owner that is affected by the regulation. *Id.*

### 1. Economic Impact on Appellees

In their pleadings, appellees claimed that estimates from Dallas Water Utilities showed that rerouting their plumbing would cost at least $30,000 per property. And this estimate did not take into account any special features such as marble or hardwood floors in the buildings that would require repair. Appellees did not plead or attach any evidence suggesting the cost to repair these special features. Additionally, appellees did not plead or

attach any evidence as to the economic impact the $30,000 would have on the properties' market values.

However, in its plea to the jurisdiction, the City attached deposition excerpts of Don Blanton, the owner of nine of the 35 affected properties. Blanton testified his properties ranged in value from $500,000 to $2 million. He estimated the cost of rerouting the plumbing to connect to the new sewer at $30,000 per property and the costs to repair damages to the buildings after rerouting the plumbing at $15,000 to $30,000 per property, depending on the special features mentioned earlier. Using Blanton's estimates, it would cost him between $45,000 to $60,000 per property to reroute the plumbing and to repair his properties. Blanton testified the market value of his properties would be reduced by this amount. Based on Blanton's testimony concerning value and expenses, we estimate the expense to reroute the plumbing and to repair any damages would decrease the value of Blanton's properties by 2.75 percent to 9 percent.

Blanton testified that, in his opinion, all of the affected properties were worth at least $100 per square foot. But appellees did not plead or submit evidence showing the square footage of any of the remaining 26 properties. Nor did appellees plead or submit evidence that their properties had been rendered completely useless or deprived of all economically beneficial use. *See Taub,* 882 S.W.2d at 826. In fact, appellees did not allege any restriction on the use of their properties. The only injuries appellees alleged were a potential future injury and a less than 10 percent impact on the market value of some of the properties.

Because Blanton testified that all of the affected properties were valued similarly and the costs to reroute the plumbing were similar for each property, we conclude that giving appellees an opportunity to amend their pleading to also claim what the economic impact will be on the remaining properties would not benefit appellees because the evidence shows that no severe economic impact, within the meaning of the case law, will result from the City's requirement that appellees reroute their plumbing at their own expense. *See Sheffield,* 140 S.W.3d at 677 (fifty percent loss of market value due to rezoning not severe economic impact because property worth more than four times purchase price); *see also Bell,* 146 S.W.3d at 825 (pleadings affirmatively negated valid takings claim); *Wilkinson,* 54 S.W.3d at 19 (court aware of no case concluding taking occurred based solely on diminution of property values in absence of significant interference with property interests).

*2. Interference with Investment-backed Expectations: State v. City of Austin Case*

Appellees also contend they had investment-backed expectations that the City would pay to reroute their plumbing. The City argues appellees' claimed expectations were not reasonable because article III, section 52(a) of the Texas constitution prohibits spending public funds on private interests.[3] Appellees contend the situation presented here is an exception to the constitutional prohibition, citing as support the case of *State v. City of Austin,* 160 Tex. 348, 331 S.W.2d 737 (Tex.1960).

---

**3.** Article III, Section 52 states:

(a) Except as otherwise provided by this section, the Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever. . . .

TEX. CONST. art. III, § 52.

In *City of Austin*, the issue was the constitutionality of a statute requiring the state to reimburse utility companies for relocating their utility lines that were in the way of highway improvements that were part of the National System of Interstate and Defense Highways. *Id.* at 740. Various municipalities and utility companies required to relocate their facilities sought reimbursement from the state. The State of Texas argued it could not pay the expense of relocating the facilities because it violated four provisions of the Texas constitution to do so.[4] *Id.* at 740–41.

The Texas Supreme Court concluded the reimbursement did not violate the constitution. The court reasoned the reimbursement to the municipalities and utility companies did not constitute an unconstitutional "gratuitous grant" because "no net gain accrues to the utility from the relocation of its facilities." *Id.* at 742–43. Instead, the reimbursement was limited to the amount paid by the utility attributable to the relocation, after deducting any increase in value of the new facility and any salvage value of the old. *Id.* Because this merely restored the utilities to the position they were in prior to the relocation of their facilities, the court referred to this reimbursement as "non-betterment costs." *Id.* at 743. The court concluded the public had a direct and immediate interest in the reimbursement of the "non-betterment cost" because the facilities, without relocation, would interfere with highway im-

provements. *Id.* at 743–45. The court reasoned that if the state did not reimburse the utilities, the costs would fall to the utilities and ultimately be borne by the local taxpayers and rate payers, the same people who also provide part of the taxes used for the highway construction. *Id.* at 745. Under these circumstances, these same taxpayers would be required to pay twice, and the legislature was authorized to "determine whether to equalize the burden by paying the entire expense from state funds." *Id.* In concluding the statute requiring the state to reimburse the utility companies was constitutional, the court stated "if the Legislature determines, as it has in this instance, that the non-betterment cost thereof should be paid by the state, it is our opinion that the same is properly attributable to highway construction within the meaning of the Constitution." *Id.* at 747.

Appellees argue that rerouting their plumbing at city expense is a "non-betterment cost" and, like the utility companies in *City of Austin*, they just want to be restored to the same position they have been in for 100 years in Deep Ellum. *See id.* at 745. But, unlike the utility companies in *City of Austin* whose lines were relocated solely because the lines were in the way of highway construction, and for the betterment of the general public, appellees' plumbing must be rerouted because the current main is substandard and deteriorating, which is for the betterment of these landowners.[5] The *City of Austin*

---

4. The state argued reimbursement was an unconstitutional (1) grant of public monies to corporations and individuals in violation of article III, section 51; (2) gift or loan of state credit in violation of article III, section 50; (3) release of obligations of corporations and individuals in violation of article III, section 55; and (4) appropriation for private or individual purpose in violation of article XVI, section 6. *City of Austin*, 331 S.W.2d at 740–41.

5. Additionally, the *City of Austin* court noted that, but for the legislature authorizing the payment to the utility companies, "the use of public money to pay a claim predicated on facts which generate no state liability constitutes a gift or donation in violation of the Constitution." *City of Austin*, 331 S.W.2d at 742.

case does not support appellees' position that they reasonably expected the city to pay to reroute their plumbing.

*Dallas City Code*

Appellees also cite section 49–59 of the Dallas City Code to support their argument that they reasonably expected the City to pay to reroute their plumbing:

(b) *Substandard condition mains.* The director is authorized to replace a water or wastewater main that is substandard as to condition when he determines that:

(1) due to its overall condition, the main is no longer economical to maintain as a part of the waste or wastewater systems; or

(2) the main is in such a condition that it poses a threat to the health or safety of persons or property.

(c) *Removal and connection of main.* When a substandard main is replaced the department shall transfer and reconnect existing service connections to the new main and remove or abandon the substandard main.

DALLAS CITY CODE, § 49–59(b) & (c).

Appellees argue that "shall transfer and reconnect existing service connections" in section 49–59(c) means "doing all work necessary to put each Appellee in the same position with the same sewer service as prior to the replacement of any substandard main." Conversely, the City argues the phrase means the City cannot refuse to reconnect a customer's service when it has relocated a main, not that it must reroute plumbing at city expense. The City also argues that when viewed in the context of other provisions of chapter 49 of the city code, as well as laws of the state, it is clear the City did not intend the interpretation advanced by appellees. We agree with the City.

■■■■ Our analysis of the ordinances is guided by the same rules of construction that we use to construe statutes. *Perez v. City of Dallas,* 180 S.W.3d 906, 911 (Tex. App.-Dallas 2005, no pet. h); *City of Coppell v. Gen. Homes Corp.,* 763 S.W.2d 448, 453 (Tex.App.-Dallas 1988, writ denied). Our primary duty is to carry out the intentions of the municipality's legislative body. *Bolton v. Sparks,* 362 S.W.2d 946, 951 (Tex.1962); *Perez,* 180 S.W.3d at 911. We look first to the plain meaning of the words. *Bd. of Adjustment of the City of San Antonio v. Wende,* 92 S.W.3d 424, 430 (Tex.2002); *Perez,* 180 S.W.3d at 911–12. If the language is unambiguous, we interpret the ordinance using its plain language unless that interpretation leads to absurd results. *See Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.,* 145 S.W.3d 170, 177 (Tex.2004); *Perez,* 180 S.W.3d at 912. We review every word, phrase, and expression as if it were deliberately chosen and presume words excluded from a statute were excluded on purpose. *Gables Realty Ltd. P'ship v. Travis Cent. Appraisal Dist.,* 81 S.W.3d 869, 873 (Tex.App.-Austin 2002, pet. denied). If the meaning of an ordinance is doubtful or ambiguous, the construction given by the body charged with its enforcement or administration is entitled to weight. *Calvert v. Kadane,* 427 S.W.2d 605, 608 (Tex.1968); *City of Alamo Heights v. Boyar,* 158 S.W.3d 545, 551 (Tex.App.-San Antonio 2005, no pet.). However, if the language is clear and plain, we are bound by its plain meaning. *Kadane,* 427 S.W.2d at 608; *Boyar,* 158 S.W.3d at 551. We construe an enactment as a whole and not its isolated provisions. *See Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004). And we do not assign meaning to a provision that would be inconsistent with other provisions of the enactment. *Baird v. City*

*of Melissa,* 170 S.W.3d 921, 925 (Tex.App.-Dallas 2005, pet. denied).

The city code does not define "transfer" and "service connections." The plain meaning of "transfer" is "to carry or take from one person or place to another." WEBSTER'S THIRD NEW INT'L DICT. 1981 at 2426–27. But the statute does not state whether the "transfer and reconnect existing service connections" means making the actual physical connection from a property owner's plumbing to the City's new main when the new main has been replaced in the same location as the old main, or whether it means, as appellees argue, the City must reroute a property owner's plumbing at city expense when a substandard main is actually relocated.

Another section of the code sheds light on the meaning of "service connection":

(a) *Maintaining service connections.* The director is authorized to maintain service connections from the mains in public rights-of-way to building laterals or building water lines on premises, pursuant to the following rules:

(1) The city is responsible for maintenance of a service connection from the main to . . . the property line in the case of wastewater service.

DALLAS CITY CODE, § 49–24(a)(1). Appellees concede section 49–24(a)(1) means the City is only responsible for maintaining the portion of the line from the City's main up to appellees' property line.

As further support, the City contends it may require a property owner to connect to the city's sewer system at the property owner's expense. TEX. LOCAL GOV'T CODE ANN. § 214.013 (Vernon 1999). And if the property owner refuses, the city may fix a lien against the property, charge the cost of the connection to the owner as a personal liability, and impose a penalty on the owner.[6] *Id.*

Additionally, section 49–56(e) of the city code authorizes the City to require the property owner to relocate its building lateral at the owner's private expense:

(e) *Private service replacements.* If the director determines it necessary to replace or relocate a . . . building lateral incidental to the . . . relocation . . . of a main under this article because of the . . . relocation . . ., the director is authorized to:

(1) require the property owner to perform the private work at the owner's expense;

\* \* \*

DALLAS CITY CODE, § 49–56(e)(1).[7]

Appellees argue that section 49–56(e) does not apply to them because their plumbing had to be rerouted due to the substandard condition of the existing main, not the relocation of the main. Appellees would have us ignore section 49–56(e), which appears to directly apply, and instead apply appellees' interpretation of section 49–59(b). This we cannot do. *See Baird,* 170 S.W.3d at 925 (court will not assign meaning to provision inconsistent with other provisions of enactment).

---

6. The Texas constitution allows a city to advance funds to a residential property owner for the relocation of sewer lines on private property. TEX. CONST. art. XI, § 12.; TEX. LOCAL GOV'T CODE ANN. § 402.901 (Vernon 1999). But the city may assess the costs against the property with repayment by the property owner over a maximum period of five years. TEX. CONST. art. XI, § 12; TEX LOCAL GOV'T CODE ANN § 402.901.

7. The city code defines "building lateral" as "the conduit or pipe extending from the building drain to the wastewater service line at the property line or other lawful place of disposal." DALLAS CITY CODE, § 49–1(6). In other words, the building lateral is the plumbing from the building to the property line where it connects to the city's service.

It is undisputed that the main was relocated, and section 49–56(e) does not limit itself to any specific reasons why a sewer is relocated. Instead, it authorizes the City to require appellees to reroute their plumbing at their own expense when necessary to connect to a relocated main. We conclude that appellees did not have a reasonable expectation that the City would pay to reroute their plumbing because of city ordinances.

In summary, and in light of the provisions of the city code, the Texas constitution, and the local government code, we conclude the City, in enacting section 49–59 of the city code, did not intend to require the City to reroute plumbing at city expense. As a result, we conclude that any investment-backed expectations appellees had that the City would reroute their plumbing at city expense were not reasonable as a matter of law.

*3. The Character of the Governmental Action*

■ Appellees argue the City exercised poor planning by allowing buildings to be constructed over the old main, preventing future access for repairs and replacement. They contend they are being asked to pay for the City's planning mistakes. But appellees do not contend the City made the decision to relocate the main to take unfair advantage of appellees. *See Sheffield,* 140 S.W.3d at 675–77 (evidence strong that city attempted to take unfair advantage of developer when decision to rezone not made until developer closed on purchase of property). And although appellees contend the City could have used other methods to install the new main in the same location without damaging appellees' properties, there was expert testimony that this was not a feasible alternative. Additionally, a city's decision on whether and how to repair a sewer is a governmental function for which the city enjoys governmental immunity. *See City of Arlington v. State Farm Lloyds,* 145 S.W.3d 165, 168 (Tex.2004) (city not liable for operation of sewer system without clear waiver of governmental immunity) (citing *Jennings,* 142 S.W.3d at 315).

In summary, appellees did not allege a valid takings claim and the City's sovereign immunity was not waived. We conclude that the trial court lacked jurisdiction and erred by not dismissing the claims for inverse condemnation.

## V. DECLARATORY JUDGMENT

Appellees also sought a declaration (1) that section 49–59 of the Dallas City Code requires the City to "transfer and reconnect at its expense existing service connections to the new main, including the connections of all of the [appellees] in this case," and (2) that the law does not prohibit the City "from paying for all of the costs for each [appellee] to reconnect their existing service to the new main sewer lines...." The City argued the trial court lacked subject-matter jurisdiction because the declaratory judgment action was "merely a disguised claim for monetary damages" for which the City did not waive its immunity. We agree.

■ The purpose of the declaratory judgment act is "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations...." Tex. Civ. Prac. & Rem.Code Ann. § 37.002 (Vernon 1997). A person affected by a statute "may have determined any question of construction or validity arising under the ... statute ... and obtain a declaration of rights, status, or other legal relations thereunder." *Id.* § 37.004. A party generally can maintain a suit to determine its rights without legislative permission because such suits are not considered "suits against the State" for purposes of sovereign immunity. *See Tex.*

*Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 855 (Tex.2002). However, a party cannot circumvent the state's sovereign immunity from suit by characterizing a suit for money damages as a declaratory judgment action. *Id.* at 856. If the suit attempts to subject the state to liability, the sovereign immunity doctrine is implicated. *See id.; City of San Benito v. Ebarb,* 88 S.W.3d 711, 721 (Tex.App.-Corpus Christi 2002, pet. denied) ("A suit which is brought ostensibly for the purpose of declaring rights, but actually seeks to impose liability on the State for damages, is a suit against the State barred by sovereign immunity.").

■ Appellees sought a declaration that section 49–59 of the Dallas City Code requires the City to pay the expense of transferring appellees' plumbing and reconnecting it to the new main. As such, it seeks to impose liability on the City for damages, which it is prohibited from doing by the doctrine of sovereign immunity. *See IT–Davy,* 74 S.W.3d at 856; *Ebarb,* 88 S.W.3d at 721. We conclude appellees' declaratory judgment claim is an attempt to characterize a suit for money damages as a declaratory judgment action and is barred by sovereign immunity. *See IT–Davy,* 74 S.W.3d at 856.

We sustain the City's sole issue on appeal.

## VI. CONCLUSION

We conclude appellees did not allege a claim for inverse condemnation. We also conclude that appellees' declaratory judgment action seeks to impose liability for which the City has sovereign immunity. As a result, the trial court erred by denying the City's plea to the jurisdiction. Accordingly, we reverse the trial court's order denying the City's plea to the jurisdiction and render judgment dismissing appellees' claims against the City for want of jurisdiction.