**CITY OF DALLAS, Appellant**

v.

**Peary A. ZETTERLUND, Appellee.**

**No. 05–07–01378–CV.**

Court of Appeals of Texas, Dallas.

Aug. 15, 2008.

Shereen El Domeiri, Assistant City Attorney, Thomas P. Perkins, Jr., Dallas City Attorney, Barbara E. Rosenberg, City of Dallas Attorney's Office, Dallas, TX, for Appellant.

Alvin H. Badger, Dallas, TX, for Appellee.

Before Justices WRIGHT, BRIDGES, and MAZZANT.

## OPINION

Opinion by Justice MAZZANT.

Appellee Peary A. Zetterlund sued appellant, the City of Dallas, for inverse condemnation. The trial court denied the City's plea to the jurisdiction, and the City perfected this accelerated interlocutory appeal from that ruling. We affirm in part and reverse and render in part.

### I. BACKGROUND

#### A. Facts

We draw this statement of facts from the allegations in Zetterlund's pleadings. Zetterlund owns an undeveloped tract of land situated on Harry Hines Boulevard

in Dallas, Texas. In December 2003, he discovered that certain City contractors were using his property as a staging site for a municipal pipeline construction project on a tract adjacent to his. The contractors were using Zetterlund's land without his knowledge or consent, and they had clear cut some of his land to provide an open area for the storage of materials and equipment and to permit easy access. When Zetterlund confronted the personnel at the project site, they assured him that his property would be restored to an acceptable condition and that he would be fairly compensated for all use made of his property. And when he complained that the clearing of his property had made it an attractive location for illegal dumping, an earthen berm was constructed that discouraged illegal dumping but also prevented him from accessing or using his property. Despite protracted negotiations, Zetterlund and the City failed to reach a settlement of his demands for compensation.

## B. Procedural history

Zetterlund sued the City and two contractors in December 2005 on three theories: (1) trespass as to the period before he discovered the invasion of his property and allowed the use to continue on promise of payment, (2) breach of implied contract for the period thereafter, and (3) quantum meruit for the entire period of use from beginning to end. After the City answered, Zetterlund filed a supplemental petition adding a fourth theory: inverse condemnation under article I, section 17 of the Texas Constitution. In the supplemental petition, he asserted that the City and its contractors had committed a "taking" of his property by "commandeering" his property without giving him notice or obtaining his consent. He further pleaded that he was entitled to judgment for the taking of his property "without fair compensation to Plaintiff for the unauthorized

use of Plaintiff's Property and the unauthorized changing of the character of Plaintiff's Property." Zetterlund did not clearly limit his inverse-condemnation claim to any particular time period.

The City filed a plea to the jurisdiction invoking the defense of immunity from suit. Zetterlund responded to the plea and filed a second supplemental petition in which he nonsuited his theories of trespass, breach of contract, and quantum meruit. He also added more material to his inverse-condemnation claim. He alleged that the City's unauthorized appropriation of his property included the physical use of his property as a "project staging area for equipment and materials," the cutting down of trees and other vegetation, and the modification of the grade of his property to facilitate the movement of project equipment and materials. Zetterlund did not clearly limit his "unauthorized appropriation" theory to any particular time period. In this pleading, he also added a new factual theory that the construction of the berm constituted a taking by denying him access to his property.

The City filed an amended plea to the jurisdiction. Zetterlund responded, and the trial court denied the amended plea after a nonevidentiary hearing. The City then filed this interlocutory appeal. It contends in a single issue that the trial court erred by denying its amended plea to the jurisdiction.

## II. STANDARD OF REVIEW

A city enjoys governmental immunity from suit for actions undertaken in the exercise of its governmental functions. *City of Dallas v. Blanton*, 200 S.W.3d 266, 271 (Tex.App.-Dallas 2006, no pet.). A valid immunity defense defeats the trial court's subject-matter jurisdiction and thus is properly asserted in a plea to the jurisdiction. *Tex. Dep't of Parks & Wild-*

*life v. Miranda,* 133 S.W.3d 217, 225–26 (Tex.2004); *Blanton,* 200 S.W.3d at 270. We review the trial court's ruling on a plea to the jurisdiction under a de novo standard. *Miranda,* 133 S.W.3d at 228. If the plea challenges the sufficiency of the claimant's pleadings, the trial court must construe the pleadings liberally in the claimant's favor and deny the plea if the claimant has alleged facts affirmatively demonstrating jurisdiction to hear the case. If the pleadings are insufficient, the court should afford an opportunity to replead if the defects are potentially curable but may dismiss if the pleadings affirmatively negate the existence of jurisdiction. *Id.* at 226–27.

If the plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court must consider relevant evidence submitted by the parties. If the evidence creates a fact question regarding jurisdiction, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact-finder. But if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 227–28. "[T]his standard generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c).... By requiring the [political subdivision] to meet the summary judgment standard of proof in cases like this one, we protect the plaintiffs from having to put on their case simply to establish jurisdiction." *Id.* at 228 (internal quotations and citation omitted).

## III. ANALYSIS

We begin with a brief review of the law of inverse condemnation. Then we examine the two distinct theories of inverse condemnation pleaded by Zetterlund: (1) the claim that the City, through its contractors, physically invaded and used Zet-terlund's property as a staging area, and (2) the claim that the City has denied Zetterlund access to his own property by constructing an earthen berm to discourage illegal dumping.

## A. Law of inverse condemnation

The Texas Constitution provides that "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." TEX. CONST. art. I, § 17. If a governmental entity takes, damages, or destroys property for public use without process or proper condemnation proceedings, governmental immunity is waived, and an action for inverse condemnation will lie. *Blanton,* 200 S.W.3d at 271. To establish the claim, the claimant must prove: (1) a governmental entity intentionally performed certain acts (2) that resulted in a taking or damaging of property (3) for public use. *Dallas, Garland & Ne. R.R. v. Hunt County,* 195 S.W.3d 818, 821 (Tex.App.-Dallas 2006, no pet.). A physical taking, as opposed to a regulatory taking, is an unwarranted physical appropriation or invasion of the property. *Blanton,* 200 S.W.3d at 271. "When damage is merely the accidental result of the government's act, there is no public benefit and the property cannot be said to be taken or damaged for public use." *City of Dallas v. Jennings,* 142 S.W.3d 310, 313 (Tex.2004) (internal quotations and emphasis omitted).

In *Jennings,* the Texas Supreme Court further explained the type of intent that must be shown in order to establish the first element of an inverse-condemnation claim. It is not enough to show merely that the governmental entity intended to perform the act that resulted in the taking or the damage, because such a standard would hold the governmental entity to a

stricter standard of liability than a private person engaging in the same acts. *Id.* Moreover, when damage is merely the accidental result of the government's intentional act, there is no public benefit and the property cannot be said to have been taken or damaged for public use. *Id.* The court held that a governmental entity

> may be liable under Article I, Section 17 if it (1) knows that the specific act is causing identifiable harm; or (2) knows that the specific property damage is substantially certain to result from an authorized government action—that is, that the damage is necessarily an incident to, or necessarily a consequential result of the government's action.

*Id.* at 314 (internal quotations omitted).

**B. Zetterlund's claims for invasion of and damage to his property**

■ With respect to Zetterlund's claims based on the invasion of and damage to his property, the City argues that the evidence defeats the first and third elements of his inverse-condemnation claim. As to the first element, the City argues that the evidence shows the City's contractors acted with nothing more than negligence when they entered, modified, and used Zetterlund's property. As to the third element, the City similarly argues that damage caused by mistake or negligence cannot be damage inflicted "for public use." Zetterlund argues that the evidence raises a genuine fact issue on both elements. Given our standard of review, the question is whether the City proved as a matter of law that at least one of the challenged elements is absent. *See Dallas County v. Gonzales,* 183 S.W.3d 94, 99 (Tex.App.-Dallas 2006, pet. denied) (governmental entity must meet summary-judgment standard of proof on plea to the jurisdiction); *see also Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991) (defendant must disprove at least one element

of plaintiff's claim as a matter of law to be entitled to summary judgment).

**1. Intent element**

First we consider whether the City proved as a matter of law that it did not know that its contractors were going to invade and use Zetterlund's property or that the invasion and use were substantially likely to result from its authorized project. *See Jennings,* 142 S.W.3d at 314.

**a. Evidence regarding the City's intent**

The evidence showed the following. The City desired to construct a 72–inch raw water pipeline connecting the Bachman Water Treatment Plant to a new raw water pump station being built adjacent to Harry Hines Boulevard. Part of the pipeline was to be constructed on City property north of and bordering on a triangular tract of land owned by Zetterlund. The City's project manager was Tino Contreras. Jacobs Civil, Inc., was the construction manager for the project and had oversight responsibilities for the other contractors on the project. Oscar Renda Contracting, Inc., ("ORCI") was the contractor that actually did the construction work on the pipeline. Evidence indicates that work on the project began in June 2003.

Although the pipeline itself did not encroach on Zetterlund's property, he discovered in December 2003 that City contractors were using part of his property as a staging site. Part of his property had been clear cut, and the grade had been adjusted both to provide an open area for the storage of construction materials and equipment and to provide easy access for the personnel and equipment involved in the project. Zetterlund testified by affidavit that he confronted construction personnel at the property and was assured that he would be fairly compensated for the use

of his property and that his property would be restored to an acceptable condition. Zetterlund also filed as evidence a letter dated March 10, 2004 in which he averred that Contreras, the City's project manager, was among those present at the initial discussion. Based on this conversation, Zetterlund authorized the continued use of his property until the project was completed. The record shows that Zetterlund and the City corresponded throughout 2004 regarding his claim for compensation and restoration of the property. The record also contains notes from a December 2004 meeting attended by Zetterlund, Douglas Zetterlund, Contreras, representatives of Jacobs, and others. The notes, which were taken by a Jacobs representative, include the following passage: "It was agreed that DWU [Dallas Water Utilities] used [Zetterlund's] property from May 27, 2003 until August 31, 2004. This duration of use was agreed to by both DWU and the Zetterlund's [sic]." Other evidence indicates that the pipeline construction itself was completed by the end of April 2004.

Contreras testified in his deposition that he did not decide to use Zetterlund's land as a staging area for the project, that he did not know who had made that decision, and that he was not aware of that decision whenever it was made. He further testified that a Jacobs representative named Jerry Nystrom told him that "operating personnel on the water treatment plant" had given him permission "to use part of the land." Contreras testified that any change to the project required a written change order approved by the city council, and that there was never a change order approving of the use of Zetterlund's land as a staging area. His recollection was that the first time he heard of the controversy was in late January or early February 2004, when Nystrom advised him that it was investigating the use of the land. Contreras testified that he met Zetterlund face to face at the property about a week after Contreras had learned about the controversy over the ownership of the land, and that Zetterlund advised him on that occasion that he owned the property and the contractors were trespassing. Contreras also acknowledged he told Zetterlund on that occasion, and wrote him letters thereafter, that the City would pay him fair compensation for the use of his land.

Rudy Renda also testified by deposition. He was the chief manager for the project for ORCI. He testified that the plans and contract documents did not reference Zetterlund's land in any way, nor did they provide any directions as to ingress and egress. He denied that the plans and specifications called for ingress and egress across Zetterlund's land. He testified that he did not recall noticing the land owned by Zetterlund during the bidding process for the project, but after ORCI won the bid Renda noticed that land and thought it would be helpful to use it for ingress and egress to the project site. He believed, based on the plans, that the City owned the land in question. He thought it would improve safety to use the area for ingress and egress because that land was at the same elevation as Harry Hines Boulevard. Under the belief that Zetterlund's land belonged to the City, Renda sought permission from the City to use the land for ingress and egress at a meeting on the project site. He remembered that Contreras was at that meeting, as well as a City inspector named William Handel. He thought that a written communication about the proposed route of ingress and egress was sent to Jim Rezda, who worked for Jacobs. He testified that both Rezda and Contreras authorized the use of Zetterlund's land, but he emphasized that he believed the land belonged to the City at the time. He testified that someone from Jacobs was on-site every day of the project and that City inspectors were also often present at the project.

Renda acknowledged that ORCI personnel cut down some trees on Zetterlund's land, but he did not know whether anyone from the City had directed that activity. There was also a berm on the property that ORCI removed to permit ingress and egress. He further testified that ORCI built a "stabilized construction entrance" on Zetterlund's property to facilitate access from Harry Hines Boulevard to a utility right of way, and the contractors then used the right of way to access the City's property where the pipeline was being built. He testified that his uncle, Oscar Renda, was the first to meet Zetterlund and learn that ORCI was on Zetterlund's property. Oscar Renda passed the information to Rudy Renda, and it was then disseminated to the City and Jacobs. Renda recalled that there was an investigation to ascertain whose property was being used and a survey group visited the site. His recollection was that ORCI was told to remove all of its belongings from the site in roughly February 2004, and it did so. It also made a diligent effort to restore the property, and in Renda's opinion ORCI left it in better condition than it was in originally. ORCI replaced the berm that it had earlier removed, but Renda did not remember who directed ORCI to rebuild it. Once the controversy arose, ORCI did not have discussions with Zetterlund about the issue; Renda believed that Jacobs and the City took on that role.

### b. Application of the law to the evidence regarding the City's intent

After applying the proper standard of review to the evidence, we conclude that the evidence raises a fact issue as to Zetterlund's inverse-condemnation claim for use of and damage to his property.

The evidence that the City intended or knew that its contractors were going to invade and use Zetterlund's land before December 2003 is weak. But the evidence is more than sufficient to raise a fact issue as to the City's knowledge after Zetterlund discovered the invasion and use in December 2003.[1] Some evidence supports the proposition that Contreras was present at the project site in December 2003 when Zetterlund confronted the construction personnel there and authorized the continued use of his property based on representations that he would be fairly compensated for the use. We must accept this evidence and disregard the contrary testimony of Contreras that he was not present at that meeting and did not meet Zetterlund until some time later. The correspondence between Zetterlund and the City in 2004 further establishes actual notice to the City of its contractors' use of Zetterlund's property in early 2004. Finally, the evidence shows that the use of Zetterlund's property continued until August 2004, several months after the City acquired actual knowledge that its contractors were using Zetterlund's property.

1. The dissent argues that Zetterlund asserts no inverse-condemnation claim for the contractors' use of his land for the time period after he discovered the invasion and put the City on notice of his ownership. On review of an order concerning a plea to the jurisdiction, "[w]e construe the pleadings liberally in favor of the plaintiff[ ] and look to the pleader['s] intent." *Miranda*, 133 S.W.3d at 226. We disagree with the dissent's interpretation of Zetterlund's pleadings, and we construe them to allege that the City "took" his property for the entire duration of its contractors' use of the property. For example, in his second supplemental petition he alleged that the "unauthorized appropriation, taking, or use" of his property included the use of the property as a staging area for equipment and materials, and he alleged in his original petition that this use continued after he gave the City notice of his ownership of the property. His nonsuiting of his contract and quantum-meruit claims also suggests that he intended to rely on the inverse-condemnation theory for the entire period of use of his property.

In sum, there is some evidence that the City knew, no later than December 2003, that its contractors were physically invading and using Zetterlund's property, that Zetterlund permitted the continuation of the use only because he was told that he would be compensated, and that the contractors' use continued until August 2004. The City did not prove as a matter of law that it did not know about or authorize its contractors' continued use of Zetterlund's land.

The City attempts to analogize this case to precedents in which the governmental entities successfully negated the element of intent. Each is distinguishable on the facts. For example, in a recent case from this Court, a railroad sued Hunt County for inverse condemnation after a county road crew left four inches of road-base material on the railroad's tracks and caused a train derailment. *Dallas, Garland & Ne. R.R.*, 195 S.W.3d at 819. The county won summary judgment, and we affirmed because

> the uncontroverted summary judgment evidence showed that the County only authorized the road-maintenance crew to place the road-base material on the roads, not on the tracks. Uncontroverted evidence also demonstrates that the County did not intend or authorize the road-maintenance crew to cause damage to the Railroad's track.

*Id.* at 821. In the instant case, by contrast, there is evidence that the City learned about Zetterlund's claim to ownership of the land in December 2003 and continued to permit its contractors to use the land under representations to Zetterlund that he would be compensated. The City did not refute the element of intent as a matter of law in this case.

The City also relies on *State v. Gafford*, No. 04–03–00168–CV, 2003 WL 22011302 (Tex.App.-San Antonio July 28, 2003, no pet.) (mem.op.), as supporting the proposition that the evidence in the instant case defeats the element of intent. In *Gafford*, Texas Department of Transportation employees undertook to clear brush and trees on a State right of way. *Id.*, 2003 WL 22011302, at *1. Gafford sued the State, alleging that those employees also entered onto his property, cut down some of his trees and brush, and parked concrete construction equipment on his property. *Id.* The trial court denied the State's plea to the jurisdiction, but the San Antonio Court of Appeals dismissed Gafford's claims for want of jurisdiction. *Id.* Like *Dallas, Garland & Ne. R.R.*, however, *Gafford* is distinguishable because in *Gafford* the State adduced evidence to establish its lack of knowledge and intent:

> At the hearing on the State's plea to the jurisdiction, the trial court was informed that when TxDOT employees were told to stop clearing the brush and trees on Gafford's property, they stopped.... The evidence reflects that the State did not intend, authorize, or even know that it was removing trees from Gafford's property until it was so informed.... Under these circumstances, the removal of brush and trees on Gafford's property was not authorized or intended by the State.

*Id.* at *3. In the instant case, by contrast, some evidence showed that the contractors continued to use Zetterlund's property for several months after the City learned that the use was in progress. *Gafford* is not on point.

We conclude that the City did not negate the first element of Zetterlund's inverse-condemnation claim for invasion and use of his property as a matter of law.

### 2. Public-use element

 Second, the City argues that Zetterlund's claim for the invasion and use of his property also fails because the invasion and use were not for a "public use," which

is the third element of an inverse-condemnation claim under article I, section 17. There are two aspects to the public-use requirement. First, the condemnor must intend a use for the property that constitutes a "public use" under Texas law. *Whittington v. City of Austin,* 174 S.W.3d 889, 896 (Tex.App.-Austin 2005, pet. denied). Second, the condemnation must actually be necessary to advance or achieve the ostensible public use. *Id.* The City argues that the use of Zetterlund's property served no "public use" because (1) it resulted from the contractors' negligence and was not intended by the City and (2) it was not "necessary" for the construction of the pipeline.

 As to the first prong of the City's argument, it is true that "[w]hen damage is merely the accidental result of the government's act, there is no public benefit and the property cannot be said to be taken or damaged *for public use."* *Jennings,* 142 S.W.3d at 313 (internal quotations omitted). But this proposition does not imply a separate intent requirement beyond that required by the first element of inverse condemnation. Rather, the *Jennings* court simply observed that the absence of the intent required for the first element of inverse condemnation necessarily implies that the public-use element is also absent. *Id.* at 313–14. It did not adopt a higher standard of intent for the public-use element beyond that required for the intentional-act element of inverse condemnation. *See id.* at 314 (when the intent element is satisfied, the taking may be "for public use"). Because we have already concluded that the City did not successfully negate the element of intent, this prong of the City's attack on the public-use element must fail.

 In the second prong of its argument, the City contends that the use of Zetterlund's property was not a public use because it was not necessary to the pipe-

line project. The second aspect of the public-use requirement is that "the condemnation must actually be necessary to advance or achieve the ostensible public use." *Whittington,* 174 S.W.3d at 896. However, merely showing that there was a "feasible alternative plan" does not prove that a particular taking or use was not "necessary." *Zboyan v. Far Hills Util. Dist.,* 221 S.W.3d 924, 930 (Tex.App.-Beaumont 2007, no pet.). In this case, the evidence shows that ORCI selected the crossing site that turned out to be on Zetterlund's land specifically because it was safer than at least one of the other options and because it was "a more desirable location for the use." The City points to evidence that the City's contractors could have accessed the project site by routes that would not have required them to cross Zetterlund's land. But the mere existence of a feasible alternative plan does not defeat the element of necessity. *Id.*

The City also relies on *Tarrant County v. English,* 989 S.W.2d 368 (Tex.App.-Fort Worth 1998, pet. denied), to support its contention that the use of Zetterlund's land was not "necessary." In that case, county employees followed a custom of spraying diesel fuel onto the beds of county dump trucks to prevent asphalt from sticking to the truck beds. *Id.* at 371. English owned some land adjacent to the location of the spraying operation, and, after he complained about the migration of spilled diesel fuel onto his property, the county switched to a biodegradable material. *Id.* at 371, 373. English then sued the county for inverse condemnation, claiming that the migration of diesel fuel onto his property constituted a taking for public use. *Id.* at 373. The trial court rendered a directed verdict for English, but the court of appeals reversed and rendered judgment for the county because the evidence showed that the migration of diesel

fuel was neither authorized by the county nor necessary for the maintenance of the truck beds. *Id.* at 374. We conclude that *English* is inapposite. In *English,* the governmental entity stopped the damaging conduct promptly after learning of the adjacent landowner's complaint, but in the instant case there is evidence that the City's contractors continued to use Zetterlund's property long after the City had actual knowledge of the invasion of his land. Moreover, in *English* there is no indication that the diesel fuel was more efficacious than the biodegradable material in preparing the truck beds, but in the instant case there is evidence that Zetterlund's land provided a superior access point as compared to the other available options. *English* is not instructive on the facts of this case.

Some evidence showed that the use of Zetterlund's land was advantageous to the pipeline-construction project. The City did not establish as a matter of law that the use of Zetterlund's land was not necessary for the project. It did not carry its summary-judgment burden of proof on this issue.

### 3. Conclusion

The trial court properly denied the City's plea to the jurisdiction to the extent it attacked Zetterlund's claim for compensation for the invasion and use of his property.

### C. Zetterlund's claim for denial of access to his property

■ A separate aspect of Zetterlund's inverse-condemnation claim is that the City caused an earthen berm to be built on his property that effectively denies him access to his own property. The City argues that the evidence established as a matter of law that no denial of access rising to the level of a taking has occurred.

■ A compensable taking can occur if governmental action causes "access to a landowner's property [to be] materially and substantially impaired." *City of San Antonio v. TPLP Office Park Props.,* 218 S.W.3d 60, 66 (Tex.2007) (per curiam); *accord State v. Delany,* 197 S.W.3d 297, 299 (Tex.2006) (per curiam). "[D]iminished access is not compensable if suitable access remains." *TPLP Office Park Props.,* 218 S.W.3d at 66. For example, closure of one access point to property does not materially and substantially impair access if another access point on a public street remains unaffected, even if the closure causes diversion of traffic or circuity of travel. *Id.* at 66–67. Moreover, impairment of access is difficult to prove when the property in question has no businesses, homes, driveways, or other improvements of any kind. *County of Bexar v. Santikos,* 144 S.W.3d 455, 460 (Tex.2004). In *Santikos,* the court held as a matter of law that there was no impairment of access to an unimproved tract when the county's conduct left easy access to a frontage road along ninety percent of the tract and the owner's only claim was that a developer might someday want to build a driveway at the single most difficult and expensive location on the entire property. *Id.* at 460–61.

The evidence pertaining to this issue is sketchy. In Zetterlund's affidavit he made only the following conclusory assertion:

> The Property was not left in a condition satisfactory to me in that an earthen berm was built to discourage dumping on the Property by third parties, but the berm has also had the effect of denying my access to the Property. My demands to have the berm removed and to install a fence with a gate have been ignored.

However, Contreras testified that Zetterlund orally agreed at a meeting in the field to the installation of the berm to prevent illegal dumping, and that Zetterlund's let-

ters denying that such an agreement had been reached were incorrect. It is not clear when the berm was built, but correspondence between Zetterlund and the City indicates that it took place between May 27 and October 28, 2004. The City put on evidence that Zetterlund has never applied to the City for a permit to construct a driveway connecting his property to Harry Hines Boulevard. And the City filed two aerial photographs of the area with Zetterlund's property marked on them. The photographs, from 2000 and 2005, show that the land is undeveloped and has no driveways connecting it to Harry Hines Boulevard.

We conclude that the evidence conclusively shows that the construction of the berm does not materially and substantially impair access to Zetterlund's land. Here, there has been no impairment of access at all. There are no driveways providing vehicular access to Zetterlund's land, so the berm cannot affect vehicular access to his property. From the photographs, it is apparent that Zetterlund's property is as accessible on foot after the construction of the berm as it was before. He has almost 500 feet of frontage on Harry Hines Boulevard on which he could conceivably build a driveway to provide reasonable access. As a matter of law, the berm does not substantially and materially impair access to Zetterlund's tract of undeveloped land.

The trial court erred by denying the City's plea to the jurisdiction with respect to Zetterlund's inverse-condemnation claim to the extent it is based on a theory of impaired access.

## IV. CONCLUSION

For the foregoing reasons, we reverse in part the trial court's order denying the City's amended plea to the jurisdiction and render judgment dismissing Zetterlund's inverse-condemnation claim to the extent it is based on a theory of impaired access.

In all other respects, we affirm the trial court's order.

WRIGHT, J., concurring and dissenting.

Dissenting Opinion by Justice Wright.

The City of Dallas appeals the denial of its amended plea to the jurisdiction. The majority affirms the trial court's order with respect to Zetterlund's claim for compensation for the invasion and use of his property and reverses the trial court's order with respect to Zetterlund's claim for denial of access. I concur in the majority's resolution of Zetterlund's denial of access claim. I disagree, however, with the majority's holding that the evidence raises a fact issue on Zetterlund's inverse condemnation claim for use and damage to his property. I respectfully dissent to that portion of the majority's opinion.

In his original petition, Zetterlund alleged that the City has failed to compensate him as promised for the use of his land "both on an *unauthorized basis initially and thereafter on an* authorized basis" and that the City continues to have his property encumbered with the earthen berm precluding access to his property. In his first supplemental petition, Zetterlund asserted his inverse condemnation claim as follows:

> The conduct of the City of Dallas and its agents, . . . , in commandeering plaintiff's property without notice to plaintiff, *without consent from plaintiff,* and without complying with the statutory guidelines required by Texas eminent domain laws constitute an unlawful "taking" by the City of Dallas and its agents.

(Emphasis added). Thus, Zetterlund confined his takings claim to the time period that the City used his property without his consent. In the same supplemental petition, Zetterlund sought damages "for the unauthorized use of plaintiff's property

and the unauthorized changing of the character of plaintiff's property." Zetterlund then filed a second supplemental petition in which he broadened his inverse condemnation claim to include the construction of the earthen berm which he alleged denied him access to his property. There is no dispute that the construction of the earthen berm occurred after Zetterlund authorized the City to use his property. Zetterlund's claims are separate and distinct, both in time and in damages. I will address these two uses as defined by Zetterlund.

### 1. Unauthorized Use

To constitute a taking of property, the government must authorize the damage in the exercise of its lawful authority. *Tarrant County v. English,* 989 S.W.2d 368, 373 (Tex.App.-Fort Worth 1998, pet. denied). Damage caused by negligent acts of employees or agents of a government do not amount to a taking. *Texas Highway Dep't v. Weber* 147 Tex. 628, 219 S.W.2d 70, 71 (1949).

Zetterlund seeks compensation for the initial intrusion onto his property, clearing of his property, and using it as a staging area for the pipeline project. He claims that City employees permitted its contractors to use his property. The City contends that such use was by mistake and not intentional as required for an inverse condemnation claim.

To support his position, Zetterlund relies on the testimony of Rudy Renda, the construction contractor for the project. Renda testified that Toni Contreras, project manager and City employee, permitted the contractors to use the land. In my opinion, this testimony would be relevant only if Contreras knew at the time that he allegedly gave permission that the land was owned by Zetterlund. There is no evidence that Contreras had knowledge of Zetterlund's ownership at the time he allegedly gave permission to the contractors to use the land.

Renda's other testimony supports the position that Contreras was not aware that Zetterlund owned the land at the time he allegedly gave permission for its use. He testified that it could be inferred from the plans that the City owned the land. Renda testified that he asked for permission to use the land at a meeting at the site attended by him, Jim Rezda, Tony Atkins, Mr. Handel, and Contreras. At this meeting, Renda was still operating under the mistaken understanding that the land was owned by the City. He testified that no one at the meeting suggested otherwise. Renda stated, "It was a reasonable error on everybody's part." In his deposition, Contreras denied that he had authorized the use of the land and he testified that no one contacted Zetterlund about the use of his land because no one knew he owned the property. Moreover, when Zetterlund brought this matter to their attention, they conducted a survey to find out who actually owned the land.

Other evidence likewise shows that the City's authorization of use of the land was without knowledge that the land was privately owned. On March 22, 2004, Zetterlund, Contreras, John Levitt, and Cliff Gaither held a meeting. The minutes from that meeting state:

> It was agreed by all parties that in fact the use of Mr. Zetterlund's property without his permission or authorization had occurred. It was stated by Messers Contreras, Levitt, and Gaither that this was not done intentionally as the Bachman Plant personnel truly thought it was DWU (Dallas Water Utilites) property and the "permission" to use the property for access, staging, and storing as needed for the installation of the pipeline was given to the contractor.

A July 30, 2004 memo to City Councilmember Mitchell Rasansky from Assistant City Manager Ramon Miguez reiterates the point that use of Zetterlund's property was "due to the lack of knowledge that the contractor was utilizing private property."

The facts in this case are similar to the facts in a case relied upon by the City. *See State v. Gafford*, No. 04–03–00168–CV, 2003 WL 22011302 (Tex.App.-San Antonio July 28, 2003, no pet.) (mem.op.). In *Gafford*, State employees mistakenly cleared a portion of Gafford's land and stored equipment on his property while working on a project for the Texas Department of Transportation. When Gafford informed the State that they were on his property, its employees quit using his property. Gafford sued the State for inverse condemnation. The State filed a plea to the jurisdiction on the ground that it had not intentionally used Gafford's property. The trial court denied the plea to the jurisdiction. In reversing the trial court's order, the court of appeals held that the State's use was negligence and negligent use does not constitute a compensable taking. Like the facts in *Gafford*, here, the City's use of the land was mistaken, not intentional.

Thus, even assuming that City employees authorized the use of Zetterlund's property as a staging site, it was given under the mistaken belief that it was City-owned property. Authorization under such circumstances does not constitute an intentional taking. *See Weber*, 219 S.W.2d at 71. In my view, the record shows only a mistaken use of Zetterlund's land, not an intentional use. Therefore, Zetterlund cannot establish the essential element of intent. Accordingly, I believe the City has not waived sovereign immunity.

## 2. Authorized Use

The only claim asserted by Zetterlund following his own authorization of the use of his property is the denial of access caused by the construction of the earthen berm. I agree with the majority's holding with respect to Zetterlund's denial of access claim.

Even assuming, however, that he asserted other claims for damages after he gave his consent to the City to use his property, I contend any such claims cannot constitute a taking as a matter of law. *See State v. Holland*, 221 S.W.3d 639, 643 (Tex.2007). As noted earlier in this opinion, Zetterlund acknowledged this fact when he pleaded his inverse condemnation claim in terms of the City entering and using his property *without his consent*.

In my opinion, the City conclusively established that it did not intentionally take Zetterlund's property before Zetterlund authorized its use. Moreover, Zetterlund's own pleadings establish that any use by the City after his authorization does not support an inverse condemnation claim. Accordingly, the City has not waived sovereign immunity. I would reverse the trial court's order denying the City's plea to the jurisdiction and render judgment granting the City's plea to the jurisdiction in its entirety.